Jason MORSE, Appellant,

v.

Carlos DELGADO, Appellee.

No. 10–97–286–CV.

Court of Appeals of Texas, Waco.

Aug. 26, 1998.

---

**3.** Italics indicates *portion which was omitted* from Williams' punishment charge.

Richard W.B. "Rick" Davis, P.C., Bryan, for appellant.

J. Hans Barcus, West, Webb, Allbritton & Gentry, P.C., College Station, for appellee.

Before DAVIS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

DAVIS, Chief Justice.

Jason Morse filed suit against Carlos Delgado for damages allegedly sustained as a result of a collision between Morse's Jeep Wrangler and Delgado's Toyota Celica. A jury found that the negligence of both proximately caused the collision; that Morse was thirty percent responsible and Delgado was seventy percent responsible for the collision; and that Morse was entitled to $3,800 in damages for past medical expenses. The jury did not award damages for past and future pain and mental anguish; past and future physical impairment; future medical expenses; or past loss of earning capacity. In accordance with the verdict, the court rendered judgment that Morse recover $2,660[1] in damages from Delgado.

Morse brings this appeal asserting in three points that the jury's award of damages is contrary to the overwhelming weight of the evidence and wholly inadequate and that the court erred in denying his motion to strike

---

1. 70 percent of the $3,800 in damages awarded.

Delgado's amended answer. We will affirm the judgment.

## FACTUAL BACKGROUND

This litigation arises from a collision between Morse's and Delgado's vehicles which occurred in College Station on May 30, 1996. Morse was driving north on Texas Avenue approaching its intersection with George Bush Drive and entered the turning lane to turn left on George Bush. Delgado was attempting to exit from a Texaco station located on the east side of Texas near the intersection. Apparently a red light caused traffic to back up on Texas, and other motorists allowed Delgado room to make his left turn. Delgado slowly crossed several lanes of traffic and entered the left turn lane. He did not see Morse's Jeep, and Morse did not see his Celica until Delgado was entering the turn lane. Morse collided with Delgado, which resulted in substantial damage to the Celica and minor damage to the Jeep.

A police officer drove upon the accident scene within minutes. Morse declined her offer to call an ambulance. According to Morse, he began to experience pain in his neck about thirty minutes after the collision. The next day he visited a chiropractor who treated him over the course of the next three months. The chiropractor also referred him to other physicians who examined him and assessed his condition.

Morse filed suit on October 31, 1996. The parties proceeded to trial on May 12 of the next year.

## FACTUAL SUFFICIENCY

Morse argues in his first point that the jury's failure to award any damages for past and future pain and mental anguish, past and future physical impairment, future medical expenses, or past loss of earning capacity is contrary to the overwhelming weight of the evidence. This point essentially challenges the factual sufficiency of the evidence to support the verdict. *See Crow v. Burnett*, 951 S.W.2d 894, 897 (Tex.App.—Waco 1997, pet. denied). Delgado responds that Morse has

waived his right to challenge the sufficiency of the evidence because his counsel signed off on a proposed judgment with the notation "approved as to form."

### WAIVER OF SUFFICIENCY CHALLENGE

██ Generally after verdict a party can obtain judgment by filing a motion for judgment or by tendering a proposed judgment to the court. *See* TEX.R. CIV. P. 301, 305. If a party files a motion for judgment on the verdict and does not indicate in some manner that it disagrees with the substance of the verdict, then that party cannot challenge on appeal the judgment it requested. *First Nat'l Bank v. Fojtik*, 775 S.W.2d 632, 633 (Tex.1989); *Litton Indus. Prod., Inc. v. Gammage*, 668 S.W.2d 319, 321–22 (Tex. 1984). This rule is nothing more than a species of the invited error doctrine which prohibits a party from complaining on appeal about an error which he invited. *See Texas Indus., Inc. v. Vaughan*, 919 S.W.2d 798, 804 (Tex.App.—Houston [14th Dist.] 1996, writ denied).

When counsel submits a proposed judgment to the court, he generally obtains consent from opposing counsel indicating that the opposing party approves the proposed judgment as to form or as to form and substance. This practice allows the court to enter judgment without conducting a hearing to determine whether the opposing party has any objections to the proposed judgment. It facilitates the prompt entry of judgment and the initiation of the appellate process. *See Fojtik*, 775 S.W.2d at 633.

In this case, Morse's counsel indicated that he did not oppose the form of the proposed judgment, but counsel did not represent that he agreed with the substance of the judgment. The rule announced in *Litton Industrial Products* does not apply in this situation. *See John Masek Corp. v. Davis*, 848 S.W.2d 170, 174–75 (Tex.App.—Houston [1st Dist.] 1992, writ denied). Thus, we reject Delgado's waiver argument.

### APPLICABLE LAW

██ A factual sufficiency challenge requires us to consider and weigh all the evidence. *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex.1985); *In re King's Estate*, 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951). We will set aside the verdict only if it is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Dyson*, 692 S.W.2d at 457.

██ In a prior opinion we set forth at length the analysis we employ when evaluating the sufficiency of the evidence to support a jury's finding of no damages. *See Crow*, 951 S.W.2d at 897–98. Although the jury awarded Morse some damages for past medical expenses, he only complains on appeal about the jury's failure to award damages for the other elements submitted. Thus, we will apply the same analysis we used in *Crow* to these uncompensated elements.

> As we stated in *Crow*,
>
> [A]ppellate courts are more reluctant to hold jury findings of no damages for pain and suffering contrary to the great weight and preponderance of the evidence when the indicia of injury and damages are more subjective than objective. The more evidence of outward signs of pain, the less findings of damages depend upon the claimant's own feelings and complaints, the more likely appellate courts are to overturn jury findings of no damages for pain and suffering.

*Id.* at 898 (quoting *Blizzard v. Nationwide Mut. Fire Ins. Co.*, 756 S.W.2d 801, 805 (Tex.App.—Dallas 1988, no writ)).[2] To facilitate our review, we set out the pertinent evidence relating to the elements of damages submitted to the jury.

### THE PERTINENT EVIDENCE

#### Carlos Delgado

According to Delgado, Morse "ran across the street to call the cops" after the collision.

---

2. Appellate courts have been cautioned not to apply the objective-subjective test too rigidly. "Although this formulation is a useful rule of thumb for determining whether a jury verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust, if rigidly applied, it too threatens to frustrate application of *Pool* [*v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986)]." Raul A. Gonzalez & Rob Gilbreath, *Appellate Review of a Jury's Finding of "Zero Damages,"* 54 TEX. B.J. 418, 420 (1991).

Initially, both told the officer they were not hurt. "At the very end," the officer asked Morse if he was okay, and "he put his hand on his neck and said, 'Yeah, my neck kind of hurts' and kind of chuckled a little bit." Morse declined the officer's offer to call an ambulance.

### Jason Morse

Morse testified that he jested with the officer when she arrived but denied joking about any injury. He explained that he did not initially think he was hurt but began to feel pain between twenty and thirty minutes after the collision. He initially testified that he did not recall telling the officer about any pain but later recalled telling her after thirty minutes had passed at the scene that he was beginning to hurt. However, he refused the officer's offer to call an ambulance. Morse testified that he carried boxes as heavy as twenty pounds later that night because he was moving. He saw no reason at the time to think he should not carry the boxes. His neck hurt more later that night. He took aspirin for the pain and slept uncomfortably.

Morse saw Dr. David Dudycha the next day. Dudycha treated him regularly for three months. Each visit relieved Morse's pain for a period of time. The pain was pretty bad at first but has decreased. Morse testified that he woke up at night "several times" because of the pain and still does "from time to time." He acknowledges that as his pain diminished over time, the treatments became less necessary. Morse testified that he stopped receiving treatments as frequently because he could not afford the time away from school, work, and family.

Morse had been laid off from work on the day of the accident. Dudycha gave him a generic absence authorization stating that he should be excused from June 3 to June 30. Morse understood this to be an excuse from strenuous activities, even though he did not have a job at the time. He testified that it would have been difficult for him to work during the month following the accident because of the pain. He began his next job with J & M Industries in the latter part of June. It was difficult to do routine things like sit at his desk because of the pain. He explained that his neck tightens and he experiences numbness in his shoulder, making it difficult to sit at his desk for long periods of time, and that he cannot perform strenuous activities like heavy lifting without feeling pain.

Morse worked as many as forty hours per week with J & M until the fall semester began. Although his position did not require heavy lifting, he testified that he did do some lifting. Delgado impeached him with his prior deposition testimony that he did not do any lifting at J & M "for a long time." Morse stated that in his present job as an engineer he is essentially a "pencil pusher." The accident did not prevent him from becoming an engineer, which is what he went to college to become.

Morse gained between fifteen and twenty pounds after the accident because he could not lift weights or play sports as before. He began exercising again around the first of April 1997 but cannot exercise as well as before. The pain is frustrating, and he is concerned about possible future medical treatments. The thought of possible surgery in the future and potential risk of paralysis "weighs" on his mind. The accident affected Morse's relationship with his family at the time of the accident because he was unemployed, but it has had no other effect.

Morse denied having any of the symptoms described prior to the collision.

### Dr. David Dudycha

Dudycha had been a chiropractor five and one-half years at the time of trial. He treated Morse regularly from May 31 to August 9, initially on a daily basis, but less frequently over time. Dudycha felt that Morse's pain was obvious because of muscle spasms in the neck, restricted mobility, and the fact that he was on pain medication. He does not believe Morse was exaggerating his symptoms. The decision to initially treat Morse five days a week rather than four was based on his "professional judgment." He testified on cross examination that he based this judgment on Morse's pain. On redirect however, he claimed that he based his determination on both subjective and objective factors. Af-

ter six weeks of treatment, some progress was detected so frequency decreased. On September 24, he made a notation that Morse "feels okay. He will call me if he needs me." Dudycha never treated him again.

Dudycha ordered an MRI because he felt Morse had a disc problem and he wanted to evaluate the extent of the injury. On cross examination, Dudycha stated that he ordered the MRI because of Morse's arm and neck pain, his restricted mobility, "and a few other tests." The MRI was performed on June 5. The radiologist's report accompanying the MRI images found a "mild central posterior bulge of the disc at C6–C7 causing some minimal thecal sac deformity but no definite nerve root or cord compression." Dudycha did not change the course of treatment after receiving the MRI results.

### DR. GREGORY POWELL

Powell had been a licensed physiatrist[3] six years at the time of trial. Twenty percent of his practice is devoted to assessing patients to determine whether they have achieved maximum medical improvement and if so to conduct an impairment rating. He evaluated Morse on October 30. The evaluation process consists of a five-page questionnaire completed by the patient, the patient's medical records, x-rays, and a physical examination. Powell diagnosed a "cervical myofacial pain secondary to a sudden deceleration injury." Powell found that Morse had achieved maximum medical improvement and assessed an impairment rating of fourteen percent, which he explained to be the percentage of Morse's body which does not perform as it used to. He explained that an impairment rating has three components: (1) a diagnosis of the injury; (2) the residual motion of the affected body part; and (3) an assessment of nerve damage. Powell found no nerve damage and based his rating on the first two components.

Powell diagnosed the disc bulge as "moderate to severe." As a result, he classified the condition as a "IIc lesion" which carries a higher impairment rating. The bulging disc is located between the C6 and C7 vertebrae

3. A doctor who practices physical medicine and

and protrudes into the spine. He explained that the spinal cord has been flattened by this protrusion, although when reviewing the MRI images, he observed that the distinction is "kind of subtle" to contrast from the rest of the cord. On cross-examination, Powell conceded that the radiologist characterized the protrusion as "mild." In his opinion the protrusion is consistent with a torn disc and means that Morse has a "weak link" in his spine. Such a tear never completely heals and is commonly thought to cause pain. Powell believes the condition is rare for a person twenty-six years old. A similar protrusion in a person forty to fifty years old could simply result from "the accumulative trauma of living." Such a person would not experience pain because of this condition. Powell explained that he could not definitively state that the disc was torn without performing surgery to examine it.

Powell believes that Morse's impairment is a result of the accident and Morse in reasonable medical certainty will suffer pain in the future because of the injury. He testified that Morse will probably require surgery in the future to fuse the disc, which will cost $20–30,000. He later conceded that he does not know whether Morse will ever require surgery, agreeing that some go through life with a similar condition and do not need surgery. He recommends ongoing medical follow-up once every six months for two or three years. He bases this recommendation for future treatment on Morse's subjective complaints.

Powell testified that the MRI was reasonably necessary for an accurate evaluation of Morse's condition. He would generally order an MRI if a patient did not respond to treatment after six weeks.

### Dr. William Blair

Blair is an orthopedic surgeon who specializes in spinal injuries. He had practiced twenty-seven years at the time of trial. He teaches nationally "and a lot in the State of Texas" on conducting impairment evaluations. He explained that "protruded discs are extremely common" and a bulging disc

rehabilitation.

does not indicate an annular tear. Blair's testimony contradicts Dudycha's and Powell's in several respects.

Blair took issue with Dudycha's decision to order an MRI three days after the collision and with his interpretation of the results of the MRI. Blair agreed that chiropractors regularly order MRI's to aid in diagnosis and treatment but stated that Morse's symptoms did not justify the use of an MRI. He disagrees with Dudycha's assessment that the protruding disc indicates an injury or that the disc is susceptible to herniation.

Blair testified that an MRI would "easily demonstrate" a tear if one existed. Morse's MRI reveals a "very small bulge" with no sign of a tear. He agrees with Powell's "cervical myofacial pain" diagnosis. However, he believes the MRI reveals a normal spine and does not indicate "any protrusion into the spinal cord." He disagrees with Powell's opinion that Morse is more susceptible to spinal injury because of the bulging disc. His interpretation is that the MRI reveals no acute or degenerative condition and that the bulging disc probably predated the collision. He explained that this is a normal finding in anyone fifteen or older.

Blair took issue with Powell's classification of the bulging disc as a "IIc lesion." According to Blair, a "IIc lesion" is a disc herniation or some significant disruptive process to a disc. He does not believe that the MRI and the radiologist's report justify a "IIc" designation. He also testified that Powell determined prematurely that Morse had reached maximum medical improvement because this conclusion should be reached only when the patient has stabilized to the point that no change of more than three percent is anticipated with treatment within the next year.

On cross-examination, he stated that he had reviewed Dr. Homero Anchondo's reports in assessing Morse's case.[4] Blair could not recall whether Anchondo is a neurologist or neurosurgeon. Anchondo diagnosed a "cervical radiculopathy most likely secondary to the protrusion of the disc at the C6–C7 area that is irritating the nerve root." According to Blair, a cervical radiculopathy is a structural problem which causes pressure on the nerve root resulting in some dysfunction. Blair disagrees with Anchondo's diagnosis even though he never personally examined Morse. He cites the inconsistency in Anchondo obtaining normal findings in a neurological exam yet concluding Morse has a radiculopathy.

Blair does not doubt that Morse has pain. However, he does not believe Morse gave his best effort in the range of motion tests, citing an October 30 test performed for Powell as an example.

### Dr. Paul Strube

Strube is a chiropractor who deals with chronic spinal patients.[5] According to Strube, Dudycha's records do not adequately document the severity of Morse's injury or his responsiveness to treatment. Thus, "[o]nly an initial trial period of treatment was warranted" because there is no documentation that the treatment provided significant benefit to Morse. Strube testified that an initial treatment period in chiropractic care would be two weeks. If the treatment does not show benefits within two weeks, a new course of action should be taken. Additional treatment is not warranted unless the treatment is adjusted. Thus, Strube concluded that Dudycha's treatment was excessive because he never significantly modified his initial treatment plan despite apparently marginal results. He also opined that the MRI was not warranted in Morse's case.

On cross examination, Strube took issue with Anchondo's radiculopathy diagnosis. He discounted Powell's impairment rating because he tested Morse five months after the accident rather than six as called for by the guidelines.

---

4. According to Dr. Dudycha's records, Morse saw Dr. Anchondo on December 19, 1996. Apparently, Morse failed to disclose Anchondo's records before the discovery deadline so the court did not allow them to be admitted.

5. Dr. Strube did not say how long he has practiced. He did testify that he has been reviewing other chiropractors' reports for two and one-half years.

## Other Evidence

According to the evidence, Morse performed three different range of motion tests: one for Dudycha on May 31; one for Dudycha on August 9; and one for Powell on October 30. These tests evaluated the maximum angle Morse could achieve in five different types of motion. Dudycha also evaluated Morse's level of pain as he performed each type of motion. Morse demonstrated pain and a restricted range of motion in each of the five areas tested on May 31. Just over two months later, Morse showed significant improvement in each of the five areas tested and less pain in three of the five areas tested. In the test conducted for Powell on October 30, Morse achieved results in four of the five areas tested which were lower than his August 9 results. In fact, he graded lower in one test for Powell than he did in Dudycha's May 31 exam.

Morse saw a family practitioner on June 6. This physician found stiffness in Morse's neck and "palpable spasms in the mid-cervical to the mid thoracic areas." He diagnosed Morse to have "a cervical strain and sprain, a thoracic strain and sprain, and bicipital tendonitis, secondary to trauma." Dr. Anchondo also found "mild stiffness" in Morse's neck.

Morse incurred the following expenses in the course of his treatment:

Dr. Dudycha: $4,461 .00

The MRI: 1,382 .20

Dr. Powell: 415 .00

The Therapy Center: 186 .00

Dr. Ruggiero: 135 .00

Total Expenses: $6,579 .20

## ANALYSIS

The testimony of Drs. Blair and Strube essentially rebutted the testimony of Drs. Powell and Dudycha. In reviewing the medical evidence, the only objective evidence of injury not rebutted by Blair or Strube was that Morse had muscle spasms and stiffness in his neck, which the family doctor classified as a "strain and sprain." In addition, the jury had to balance Morse's testimony that he experienced pain against Delgado's testimony that he joked with the officer as if he were faking an injury.

Morse also contends that the fact the jury awarded some compensation for past medical expenses demonstrates that the failure to award damages for past pain and mental anguish is contrary to the overwhelming weight of the evidence.[6] However, similar arguments have been rejected by other courts. *See Blizzard,* 756 S.W.2d at 804–05; *McGuffin v. Terrell,* 732 S.W.2d 425, 427–29 (Tex.App.—Fort Worth 1987, no writ); *see also Hyler v. Boytor,* 823 S.W.2d 425, 427–28 (Tex.App.—Houston [1st Dist.] 1992, no writ); *Hammett v. Zimmerman,* 804 S.W.2d 663, 668–69 (Tex.App.—Fort Worth 1991, no writ); *Sibert v. Enriquez,* 774 S.W.2d 812, 813–14 (Tex.App.—El Paso 1989, writ denied).

We have twice applied the principles enunciated in these decisions in cases where juries awarded no damages for any element of damages submitted. *See Crow,* 951 S.W.2d at 897–99; *Lance v. USAA Ins. Co.,* 934 S.W.2d 427, 429–30 (Tex.App.—Waco 1996, no writ). We will likewise follow them in this case.

The jury must determine the credibility of the witnesses and the weight to be given their testimony. *Crow,* 951 S.W.2d at 899. We should not substitute our judgment for the jury's on these issues. *Id.* "Weighing the many subjective complaints against the [few] objective injur[ies] that might have been caused by this accident, it is apparent that the indicia of injury are more subjective than objective." *Hyler,* 823 S.W.2d at 428; *cf. Hammett,* 804 S.W.2d at 667–68.[7] Our

---

6. Morse explicitly states that the verdict is "fatally inconsistent." However, he does not challenge the verdict on this basis, presumably because he failed to preserve the issue for our review by not asserting it in his motion for new trial. *See First Tex. Serv. Corp. v. McDonald,* 762 S.W.2d 935, 939–40 (Tex.App.—Fort Worth 1988, writ denied).

7. In *Hammett,* the treating physician found muscle swelling and spasm, inflammation of the trigeminal nerve, and lower back strain. These findings were significantly bolstered by subsequent x-rays and a postural survey which revealed: "(1) listing of the lumbar spine to the left (7% scoliosis with a convexity to the left); and (2) declination of the sacral base plane (left iliac

review of the record leads us to the conclusion that the jury based its verdict on nothing other than the evidence presented and "conscientious conviction." *Blizzard,* 756 S.W.2d at 805; *McGuffin,* 732 S.W.2d at 429. Accordingly, we conclude that the verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong or manifestly unjust. *See Dyson,* 692 S.W.2d at 457. We overrule Morse's first point.

## INADEQUACY OF DAMAGES

■ Morse urges in his second point that the jury's failure to award damages for the uncompensated elements is wholly inadequate. *See* TEX.R. CIV. P. 320. Rule 320 provides in pertinent part that a trial court may grant a new trial "when the damages are manifestly too small." *Id.* Such a complaint "is but a special example of the contention that the findings are supported by insufficient evidence or are contrary to the great weight and preponderance of the evidence." Joe D. Roth, *Inadequate Damages as Basis for New Trial,* 44 TEX. B.J. 369, 369 (1981); *accord Davis v. J.H. Rose Truck Lines, Inc.,* 578 S.W.2d 421, 423 (Tex.Civ.App.—Houston [1st Dist.] 1979, no writ); Raul A. Gonzalez & Rob Gilbreath, *Appellate Review of a Jury's Finding of "Zero Damages,"* 54 TEX. B.J. 418, 422 n. 2 (1991).

■ According to our research, the primary distinction between a claim of inadequate damages and a challenge to the factual sufficiency of the evidence to support a damages finding is that in the former, we view the evidence "in the light most favorable to the appellee and indulge every legitimate conclusion favorable to appellee which might have been drawn from the facts proved." *Walker v. Missouri Pac. R.R. Co.,* 425

S.W.2d 462, 465 (Tex.Civ.App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.); *accord* Roth, *supra* at 369–70.

We have already concluded without viewing the evidence in the light most favorable to Delgado that the evidence supports the jury's verdict. Thus, we cannot say that the jury's award of damages is manifestly too small. Accordingly, we overrule Morse's second point.

## DELGADO'S AMENDED ANSWER

■ Morse asserts in his final point that the court erred in denying his motion to strike Delgado's amended answer. The record reflects that Delgado filed his first amended answer ten days before the date of trial. The certificate of service accompanying the amended answer indicates Delgado mailed a copy to Morse's counsel via certified mail. Morse's counsel filed a motion to strike the amended pleading on the morning of trial, representing to the court that he never received a copy of the pleading and was surprised by the new defensive matters asserted in the amended answer. The court denied this motion. Morse did not request a continuance.[8]

■ To preserve for appellate review a claim that the trial court erred in granting an amendment within seven days of trial,[9] the complaining party must demonstrate surprise and request a continuance. *Louisiana & Ark. Ry. Co. v. Blakely,* 773 S.W.2d 595, 597 (Tex.App.—Texarkana 1989, writ denied); *Greenstein, Logan & Co. v. Burgess Mktg., Inc.,* 744 S.W.2d 170, 184 (Tex.App.—Waco 1987, writ denied). Morse failed to move for a continuance after the court denied his motion to strike Delgado's amended an-

crest was decreased)." *Hammett v. Zimmerman,* 804 S.W.2d 663, 668 (Tex.App.—Fort Worth 1991, no writ). No witness contradicted these two objective findings. The Fort Worth court distinguished its previous opinion in *McGuffin* because the "uncontradicted analysis of the x-rays and postural survey provide[d the court] with additional, more compelling evidence of objective injury than that provided to th[e] court in *McGuffin." Id. Hammett* is distinguishable from the present *case in that* the medical experts dispute whether Morse's MRI reveals any defect in his disc.

**8.** In fact, immediately after denying the motion to strike the amended answer, the court asked the parties if they were ready to proceed. Both sides announced ready; the *petit* jury was seated in the courtroom and sworn; and the case proceeded to trial.

**9.** Morse argues that because he did not receive notice of the amended pleading before the day of trial the court's decision to allow Delgado to proceed on the amended answer is tantamount to a ruling permitting a trial amendment.

swer. Moreover, he announced ready for trial after the court's ruling. For these reasons, he has failed to preserve for our review the propriety of the court's decision. Accordingly, we overrule his third point.

We affirm the judgment.

VANCE, J., concurring.

VANCE, Justice, concurring.

Without retreating from my dissents in *Lance v. USAA Ins. Co.*, 934 S.W.2d 427, 431–33 (Tex.App.—Waco 1996, no writ) and *Crow v. Burnett*, 951 S.W.2d 894, 900 (Tex. App.—Waco 1997, pet. denied), I concur.