**Barbara Kay Blake BEARD, Appellant,**

v.

**Bramlet Frank BEARD, Appellee.**

**No. 10–98–357–CV.**

Court of Appeals of Texas, Waco.

April 18, 2001.

Opinion Denying Rehearing June 27, 2001.

LaNelle L. McNamara, McNamara & McNamara, Waco, for appellant.

W.V. Dunnam, Jr., Dunnam & Dunnam, L.L.P., Waco, for appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

## OPINION

DAVIS, Chief Justice.

Barbara Kay Blake Beard appeals a divorce decree dissolving the marriage between Bramlet Frank Beard and herself. Barbara presents sixteen issues in which she challenges: the authority of the judge assigned under chapter 74 of the Government Code to render judgment after an extended, post-trial hospitalization; the sufficiency of the evidence to support the court's findings of fact and conclusions of law; the court's failure to make amended or additional findings of fact and conclusions of law; the court's deferral until after trial of a ruling on her motions to strike an amended pleading filed by Bramlet less than seven days before trial and to exclude evidence relevant only to claims

asserted for the first time in this amended pleading; the classification of certain of the parties' assets; the reimbursements among the community and separate estates; the division of the community estate; and the appointment of a receiver to sell the parties' residence "to the highest bidder."

## AUTHORITY OF ASSIGNED JUDGE

Barbara's first issue asserts that the original decree signed by Judge Kenneth Douglas in this case is void because his assignment was superceded and terminated by intervening assignments of other judges to the case after he was hospitalized. Her second issue claims that any actions Judge Douglas took after she filed a recusal motion are void because she timely objected to his "reassignment" to the case.

According to the record, the presiding judge of the Third Administrative Judicial Region, B.B. Schraub, appointed Judge Douglas to hear the Beard divorce case after the elected judge recused himself. The assignment order provides in pertinent part:

THE STATE OF TEXAS

THIRD ADMINISTRATIVE
JUDICIAL REGION

ORDER OF ASSIGNMENT BY
PRESIDING JUDGE

Pursuant to Section 74.056, Texas
Government Code

On the: 14th day of: October, 19: 97

The Honorable: KENNETH
A. DOUGLAS

SENIOR Judge of the: 13TH
District Court.

was assigned to the: 74TH District Court of: McLENNAN County, Texas.

RE: Cause Number 97–1973–3—IN THE MATTER OF THE MARRIAGE OF BARBARA BEARD and BRAMLET BEARD and any other matter coming before the court while sitting on assignment in this cause.

This assignment will begin on the: 14TH day of: October, 19:97 and will continue for the period of time that may be deemed necessary for the assigned Judge to complete trial of any case or cases begun during this period, and to pass on motions for new trial and all other matters growing out of cases tried by the Judge herein assigned during this period.

After this assignment, the parties proceeded to trial before the court in November 1997. At the conclusion of the trial, Judge Douglas orally granted a divorce but postponed the classification of the parties' assets and division of the community estate.

Judge Douglas entered a hospital on February 18, 1998. He remained hospitalized until August 1998. Judge Schraub assigned Judge James F. Clawson to the Beard case on July 7, 1998. Bramlet filed an objection to Judge Clawson's assignment. *See* TEX. GOV'T CODE ANN. § 74.053(b) (Vernon 1998). Thus, Judge Clawson was automatically disqualified and could not hear the Beard case. *See In re Perritt,* 992 S.W.2d 444, 446 (Tex.1999) (orig.proceeding); TEX. GOV'T CODE ANN. § 74.053(b). Accordingly, Judge Schraub assigned Judge Joe B. Dibrell, Jr. to the case on August 11, 1998.

In September 1998, the parties received a decree signed by Judge Douglas. The decree recites on its face that it was "signed on April ___, 1998." Under Rule of Civil Procedure 306a(2), "If the date of signing is not recited in the judgment or order, it may be shown in the record by a certificate of the judge or otherwise; pro-

vided, however, that the absence of a showing of the date in the record shall not invalidate any judgment or order." TEX. R.CIV.P. 306a(2). Although Judge Douglas has not filed a certificate reciting the date of signing, the parties agree that he signed the decree on September 15, 1998, which is the date of the letter by which the judge advised the parties of the filing of the judgment. We accept this as correct for purposes of this appeal. *See* TEX.R.APP.P. 38.1(f).

## SCOPE OF AUTHORITY

An assigned judge's authority depends upon a valid assignment by the presiding judge. *See In re Nash*, 13 S.W.3d 894, 899 (Tex.App.—Beaumont 2000, orig. proceeding). The scope and extent of that authority depends on the terms and conditions of the assignment. An assigned judge sits in all other respects as the judge of the court to which he is assigned. *See* TEX.GOV'T CODE ANN. § 74.059 (Vernon 1998); *In re PG & E Reata Energy, L.P.*, 4 S.W.3d 897, 900 (Tex.App.—Corpus Christi 1999, orig. proceeding). A judge assigned to a district or statutory county court may hear and determine a matter pending in any district or statutory court in the county. *See* TEX. GOV'T CODE ANN. § 74.094(a) (Vernon Supp.2001).

## OTHER CASES

Barbara contends on appeal that the judgment was signed "at a point in time when Judge Douglas was no longer the judge assigned to this case." Citing *Starnes v. Chapman* and *Roberts v. Ernst*, she says that "[o]nce the assignment of an

assigned judge has ended and another judge has been assigned to preside over and hear the case, the Judge who was previously assigned has no authority to act on any matter relating to the case." *Starnes*, 793 S.W.2d 104 (Tex.App.—Dallas 1990, orig. proceeding); *Roberts*, 668 S.W.2d 843 (Tex.App.—Houston [1st Dist.] 1984, orig. proceeding). Because each case is distinguishable, we disagree with her conclusion.[1]

### *Starnes v. Chapman*

In *Starnes*, Judge Ryan was assigned to hear cause number 86–7704–I in the 162nd District Court in Dallas. According to the Fifth Court of Appeals, the assignment "to cause No. 86–7704–I was to continue for a period of time as may be necessary for Judge Ryan to complete trial of the case and to pass on motions for new trial and all other matters growing out of the case." *Starnes*, 793 S.W.2d at 106. Judge Ryan granted a summary judgment on some claims and severed other claims into causes 89–6582–I and 89–10016–I. Another judge, Judge Wright, was assigned to hear the severed cases, but he was objected to, preventing his hearing those cases. Judge Ryan was then assigned to hear the severed causes, and he was objected to. After the summary judgment was reversed, he was assigned to hear cause number 86–7704–I on remand but was objected to in that case as well. The presiding judge of the administrative region who had made all these assignments overruled the objections to Judge Ryan and reassigned him to all three cases.

1. Although we decide this issue on other grounds, we note that the Supreme Court recently held that an objection to a judge assigned under chapter 74 is timely if it is filed before the very first hearing or trial in the case, without regard to the particular order under which the judge is assigned. *See In*

*re Canales*, 44 Tex. Sup.Ct. J. 407, 410, 2000 WL 33146426, at *4, —— S.W.3d ——, —— (Feb. 1, 2001). Thus, even if we were to construe Judge Schraub's letter as a "reassignment" of Judge Douglas, Barbara's objection to that "reassignment" came too late. *Id.*

In conditionally granting a writ of mandamus, the Dallas Court held that under the terms of his assignment order Judge Ryan's assignment to the original cause expired when the time periods for filing and ruling on motions for new trial expired and appeal was perfected. *See Starnes,* 793 S.W.2d at 106. The court further held that Judge Ryan was without authority to hear the remanded case unless reassigned. *Id.* (citing *Roberts,* 668 S.W.2d at 846).

As to the severed cases, the court held, "[O]ur reversal of the [summary judgment] did not reinvest Judge Ryan with authority over the severed causes of action by virtue of his original assignment...." *Id.* at 107. Although the court stated that the "intervening assignment of [Judge Wright] to those cases superseded [the] assignment [of] Judge Ryan and terminated Judge Ryan's authority," it *held* that Judge Ryan's authority over the severed cases terminated when they were severed. *Id.* Because he was thereafter reassigned, the court found the objection to that assignment to be valid.[2] *Id.*

### Roberts v. Ernst

In *Roberts,* the First Court of Appeals was confronted with a situation in which Judge Dickerson, a sitting judge, was assigned to another district court for one week and for such time thereafter as necessary to complete trial of any case begun during that week "and to pass on all motions for new trial and all of the matters growing out of cases tried by the judge herein assigned during this period." *Roberts,* 668 S.W.2d at 844. Judge Dickerson conducted the trial, then granted a motion for new trial. Two months later, he vacated an order granting a continuance that another assigned judge had granted and ordered a change of venue. Two months after that, one of the regular judges of that county vacated the transfer order and denied the motion to change venue.

The First Court noted that the assignment was for a one-week period and to continue after that as was necessary to complete trial in any case begun during that week and "to pass on all motions for new trial and all matters growing out of cases tried." *Id.* at 846. Thus, it construed his assignment as requiring him to proceed to trial on all cases set on his docket and to rule on all issues that arose during the course of a trial. *See id.* The court held that, because of the terms of his assignment order, when Judge Dickerson granted the new trial his assignment and his authority ceased. *Id.* It is true that the court also held that a later assignment of another judge superceded Judge Dickerson's assignment, but that holding was unnecessary to the decision as the court had already determined that his assignment was completed and his authority had ceased. *Id.*

### O'Connor v. Lykos

In *O'Connor v. Lykos,* the presiding judge assigned Judge Lykos to the 309th District Court for one week and thereafter "as may be necessary for the assigned Judge to complete trial of any case begun during the period, and to pass on motions for new trial and all other matters growing out of cases tried by the Judge herein assigned during this period." *O'Connor v. Lykos,* 960 S.W.2d 96, 97 n. 1 (Tex.App.—

---

2. The Dallas Court has interpreted *Starnes* in a similar manner: "[T]his Court concluded that Judge Ryan's initial assignment expired along with his plenary power over the summary judgment. Consequently, when the case was remanded, Judge Ryan was without authority to proceed further unless he was reassigned and Starnes's objection was timely." *Ex parte Holland,* 807 S.W.2d 827, 828–29 (Tex.App.—Dallas 1991, orig. proceeding) (citations omitted).

Houston [1st Dist.] 1997, orig. proceeding). Judge Lykos granted a default judgment in March, then on June 2 signed an order granting a new trial and setting the case for trial on June 24. Also on June 2, the presiding judge again assigned Judge Lykos to the 309th District Court. *See id.* at 97. This time, a party objected to the assignment, which the judge overruled. *Id.* at 97–98. The party then sought mandamus relief to set aside the "void orders" that resulted. *Id.* at 98.

In conditionally granting mandamus, the First Court held that Judge Lykos's authority under the first assignment terminated "when she signed an order granting a new trial" and that the objection under section 74.053(c) was timely as to the second assignment. *Id.* at 99. Thus, all orders entered thereafter were void. *Id.*

### NECESSITY OF A TERMINATING EVENT

■ These decisions teach us that once a judge is assigned under a valid assignment order, such as the one in this case, termination of his authority (generally and as to specific cases) occurs only upon some event. Termination of authority depends on the terms of the assignment. It may be a date specified by the assignment order (most assignments described in the cases are for one day, two days, one week, etc.), *i.e.,* the judge's general authority over cases in the court to which he was assigned terminates on that date. It can be an event such as the signing of a judgment which becomes final or is appealed or a ruling on a motion for new trial, *i.e.,* the judge's authority over a specific case ends upon that event. In each instance however, the terms of the written assignment control when the assigned judge's authority terminates as to a specific case. Here, no such event occurred, and Judge Douglas's authority under the assignment was still in effect at the time he signed the final decree in September 1998.

### TERMINATION OF AUTHORITY BY LATER ASSIGNMENT

Neither of the assignment orders by which Judges Clawson and Dibrell were assigned explicitly revoked or terminated Judge Douglas's authority over this case. Indeed, contrary to Barbara's assumption, Judge Schraub had no authority to revoke Judge Douglas's assignment.

Judge Schraub sent the following letter to the parties and Judges Dibrell and Douglas on October 8:

Dear Judges and Attorneys:

I have been advised there is some confusion as to the judge presently assigned in the above matter. This office has previously assigned Judges Kenneth Douglas, James Clawson and Joe Dibrell. We have been advised there was an objection to Judge Clawson.

The assignment of Judge Dibrell was made because Judge Douglas became ill before the entry of a final judgment. At the time, there was a question as to when or if Judge Douglas would be able to resume work. Since that time, Judge Douglas has recovered, and is able and willing to work as a judge. It is the opinion of the undersigned that Judge Douglas is the judge currently assigned to the above case, and until such time as he steps aside, is authorized to preside over this case.

We agree with Judge Schraub that as of September 1998, Judge Douglas's authority to act in the Beard case continued because he had begun trial during his assignment and no event had caused his assignment to terminate under the terms of the assignment order. *See O'Connor,* 960 S.W.2d at 99; *Starnes,* 793 S.W.2d at 107; *Roberts,* 668 S.W.2d at 846.

Barbara's argument that the later assignment of another judge terminated Judge Douglas's authority must be based on the notion that two judges cannot have authority over the same case at the same time. We disagree with that proposition. In fact, under our judicial system, more often than not multiple judges have authority over any given case at any given time. *See, e.g.* TEX. CONST. art. V, § 11 (district judges may exchange districts or hold court for each other when they deem it expedient); TEX. GOV'T CODE ANN. § 24.330 (Vernon 1988) (in counties with two or more district courts, judges of those courts may, in their discretion, exchange benches or districts); TEX.R.CIV.P. 330(e) (in counties with two or more district courts, judges may, in their discretion, exchange benches or districts); *Camacho v. Samaniego*, 831 S.W.2d 804, 810–11 (Tex. 1992) (under section 74.094 of the Government Code, district and statutory county court judges may, within a county, exchange benches or sign a judgment or order in another court without transferring the case). Because of the way our judicial system is structured, we perceive no reason to conclude that the assignment of a judge necessarily terminates the authority of a judge who was assigned earlier and whose assignment, by its terms, remains in effect. Simply because two judges might have authority over the same case at the same time does not require that result.

We acknowledge that the *Starnes* opinion discusses the termination of an assigned judge's authority by a later assignment of another judge and the *Roberts* opinion "holds" that. *See Starnes*, 793 S.W.2d at 107; *Roberts*, 668 S.W.2d at 846. In neither case was that issue essential to the decision, because in each the court had found an earlier event that terminated the assigned judge's authority. Furthermore, because we believe that any such "holding" is incorrect, we decline to follow those cases in that respect.

There is an additional policy reason for our conclusion. To hold that a presiding judge could terminate the authority of an assigned judge at any time simply by assigning another judge would undermine the judicial independence of all assigned judges. We find nothing in chapter 74 of the Government Code that authorizes a presiding judge to remove an assigned judge or to terminate his authority, once given. The extent of and limits on an assigned judge's authority are those set forth in his assignment order. Furthermore, Judge Douglas did nothing that would authorize his removal as a public official. He presided over the case, including the trial on the merits, became ill, recovered, and signed the decree. We find no fault in the process by which he accomplished this.

Having found that Judge Douglas's authority never terminated, he had the authority to sign the final decree in September 1998. We overrule Barbara's first issue.[3]

## RECUSAL

Barbara's second issue claims that a decree signed by Judge Douglas after she filed a recusal motion is void because she timely objected to his "reassignment" to the case. She concedes, however, that "no formal order of reassignment was made by the Presiding Judge."

The parties agree that Judge Douglas signed the decree on September 15, 1998. Barbara filed a motion to recuse Judge Douglas on October 19. Judge Douglas

---

3. The criminal rule seems to be that the expiration of a judge's assignment does not render a conviction void. *See Wilson v. State*, 977 S.W.2d 379, 380–81 (Tex.Crim.App.1998).

resigned the decree "in Waco, Texas" on December 15, 1998, and it is the December decree that she attacks in her second issue.

■ Barbara's motion to recuse Judge Douglas was filed under Rule 18a of the Rules of Civil Procedure.[4] *See* TEX. R.CIV.P. 18a. It was not an *objection* to his "reassignment."[5] Rule 18a requires that such a motion be filed at least ten days before the date of the first hearing or trial over which the judge is to preside. *Id.* 18a(a). As the El Paso Court of Appeals observed in a family law case involving a motion to recuse filed after judgment on a motion to modify visitation, after a request for findings of fact and conclusions of law and the findings were made, after a motion to suspend the judgment during appeal, and after a motion for additional or amended findings and conclusions:

> When a motion to recuse a judge is filed, the judge must either recuse him—or herself or request the administrative judge to assign another judge to hear the motion. In either case, the judge is prohibited from taking any further action in the case until the motion to recuse has been resolved. The mandatory provisions in Rule 18a, however, never come into play unless and until a timely motion to recuse is filed.

The record in the instant case shows that Appellant did not file a timely Motion to Recuse the trial judge. Conse-quently, we find Rule 18a inapplicable in this case.

*Wright v. Wright,* 867 S.W.2d 807, 811 (Tex.App.—El Paso 1993, writ denied) (citations omitted). After Judge Douglas signed the decree on September 15, it was filed with the clerk on September 23. A "Notice of Appealable Order" was mailed by the clerk to Bramlet and to Barbara on September 24. On October 5, Barbara filed a motion to set aside the decree for lack of authority and a request for findings of fact and conclusions of law. Not until October 19 did she file the motion to recuse Judge Douglas.

■ Barbara does not attack the validity of the September 15, 1998, decree on any grounds other than that Judge Douglas's authority had terminated. In discussing issue one, we concluded that his authority continued under the terms of the original assignment order and that the September 15 decree is valid. Thus, whether the decree that was "resigned" in December was valid or void does not affect the validity of the September decree as a decree. The December decree is identical in every respect to the September decree, except that it notes that it was signed in "Waco, Texas." Even if we were to consider that it changed or modified the September decree in some way that would make its validity critical to our review of this case, we would and do find that the motion to recuse Judge Douglas, made after he had presided over extensive pre-trial proceedings and had heard the case

---

4. Judges may be removed from a particular case because they are constitutionally disqualified, subject to a statutory strike, or subject to recusal under the civil procedural rules. *See In re Union Pac. Resources Co.,* 969 S.W.2d 427, 428 (Tex.1998) (orig.proceeding).

5. When a party timely *objects* to an assigned judge under section 74.053 of the Government Code, the judge's removal is mandatory.

*See* TEX. GOV'T CODE ANN. § 74.053(b) (Vernon 1998); *In re Perritt,* 992 S.W.2d 444, 446 (Tex.1999) (orig.proceeding); *Dunn v. Street,* 938 S.W.2d 33, 34 (Tex.1997) (orig.proceeding); *Flores v. Banner,* 932 S.W.2d 500, 501 (Tex.1996) (orig.proceeding). Any subsequent orders by the assigned judge are void. *See Dunn,* 938 S.W.2d at 34–35; *Flores,* 932 S.W.2d at 501.

on its merits, was untimely.[6] *See* Tex. R.Civ.P. 18a(a); *Wright*, 867 S.W.2d at 811. We overrule Barbara's second issue.

SUMMARY

Based on our conclusions that Judge Douglas's authority under the assignment order never terminated and that the motion to recuse him was untimely, we hold that the decree of divorce is not void. Thus, we proceed to the remaining issues.

## LATE–FILED PLEADINGS

Barbara's fifth issue challenges the court's deferral until after trial of rulings on her motion to strike Bramlet's Third Amended Answer and Cross Petition for Divorce and her motion to exclude evidence relevant only to issues raised for the first time in this pleading. The parties do not dispute that Bramlet filed the complained-of pleading six days before trial. However, to preserve such a complaint for appellate review, the complainant must demonstrate surprise and request a continuance. *See Morse v. Delgado*, 975 S.W.2d 378, 386 (Tex.App.—Waco 1998, no pet.); *Greenstein, Logan & Co. v. Burgess Mktg., Inc.*, 744 S.W.2d 170, 184 (Tex.App.—Waco 1987, writ denied). Barbara did not request a continuance. Thus, she did not properly preserve this complaint. Accordingly, we overrule her fifth issue.

## FINDINGS OF FACT/CONCLUSIONS OF LAW

Barbara contends in her sixth issue that the court erred by refusing to enter the amended "and/or" additional findings of

fact and conclusions of law she requested. However, she does not contend that she has been harmed in any respect by the court's refusal to make the requested findings.

A trial court's refusal to make findings of fact does not require reversal if "the record before the appellate court affirmatively shows that the complaining party suffered no injury."[7] *Tenery v. Tenery*, 932 S.W.2d 29, 30 (Tex.1996) (quoting *Cherne Indus., Inc. v. Magallanes*, 763 S.W.2d 768, 772 (Tex.1989)). An appellant has suffered injury from such refusal when the circumstances of the case require her to guess the reason or reasons the court ruled against her. *See Chandler v. Chandler*, 991 S.W.2d 367, 389 (Tex. App.—El Paso 1999, pet. denied); *Rafferty v. Finstad*, 903 S.W.2d 374, 380 (Tex. App.—Houston [1st Dist.] 1995, writ denied); *Sheldon Pollack Corp. v. Pioneer Concrete of Tex., Inc.*, 765 S.W.2d 843, 845 (Tex.App.—Dallas 1989, writ denied).

Barbara does not allege that she has been harmed by the court's refusal to make the additional findings requested. The circumstances of this case do not indicate that she must guess the rationale for the court's adverse rulings. Accordingly, we conclude that she has not been harmed by the court's refusal to make the requested additional findings. *See Roberts v. Padre Island Brewing Co.*, 28 S.W.3d 618, 622 (Tex.App.—Corpus Christi 2000, pet. denied). Thus, we overrule her sixth issue.

---

6. When a judge is constitutionally disqualified, any order involving judicial discretion by that judge is "absolutely void," "a nullity," and is an error that can be raised at any point in the proceeding. *See Buckholts Indep. School Dist. v. Glaser*, 632 S.W.2d 146, 147 (Tex.1982); *see also Union Pac. Resources*, 969 S.W.2d at 428; Tex. Const. art. V, § 11.

7. The original quotation is from *Wagner v. Riske. See Cherne Indus., Inc. v. Magallanes*, 763 S.W.2d 768, 772 (Tex.1989) (quoting *Wagner*, 142 Tex. 337, 343, 178 S.W.2d 117, 120 (1944)).

## SUFFICIENCY OF EVIDENCE

In Barbara's third and fourth issues respectively, she contends that there is no evidence to support the court's findings of fact and such findings are contrary to the great weight and preponderance of the evidence.

In addition to the general no-evidence and great weight challenges raised in Barbara's third and fourth issues, she contends in her seventh issue that the court erred in failing to confirm as her separate property: (1) a three percent interest in the parties' residence attributable to funds she allegedly contributed from her separate property for closing costs; (2) all funds which she owned before marriage and placed in a CD at the Ennis State Bank; and (3) all amounts which she received by virtue of an inheritance.[8]

Barbara avers in her eighth issue that the court erred in failing to reimburse the community estate from Bramlet's separate estate for: (1) community funds and assets used to pay a debt on Bramlet's separate property rental condominium; (2) losses sustained by the community from the condominium; and (3) community funds wasted by Bramlet in strip clubs.

Barbara's ninth issue contests the court's failure to compensate her separate estate from the community estate for approximately $60,000 in attorney's fees which she has paid from her separate property funds to prosecute the divorce. Her twelfth issue challenges the court's failure to award her separate estate moneys from the community estate for Bramlet's alleged breach of fiduciary duty as her husband and as her bank officer with regard to her separate property funds on deposit at the Ennis State Bank.

8. Although Barbara contends that the court "erred" in the rulings complained of in the 7th, 8th, 9th, and 12th issues, the form and content of her brief suggest that she is assert-

## FINDINGS AT ISSUE

Under these issues, Barbara expressly challenges Findings of Fact Nos. 8, 9, 10, and 11, in which the court found:

8. During the marriage of the parties herein $7,000.00 of Respondent's separate party, received by him as a gift from his mother, was paid on the purchase price of a $17,350.00 diamond ring possessed by and awarded to Petitioner herein and $6,000.00 of its purchase price was from the community estate of the parties.

9. Petitioner failed to allege in any pleading herein that said ring, any part thereof or any of the above sums paid thereon, was a gift to her and failed to prove such by even a preponderance of the evidence, much less by clear and convincing evidence.

10. During the existence of the marriage of the parties herein a home improvement loan was procured by the parties for the making of permanent and valuable improvements on their homestead and $5,548.00 of Respondent's separate property was paid in satisfaction of said improvement loan, for which Respondent's separate estate has a charge against said homestead.

11. During the period that payments from the community estate of the parties herein were made on the condominium that was Respondent's separate property, the community estate of the parties derived monetary benefits from the rental value of said condominium that were $200.00 per month in excess of the payments thereon and major tax benefits.

ing no-evidence and great-weight challenges against the court's rulings on these issues. Accordingly, we address them in this manner.

She also appears[9] to challenge the next three findings:

12. At the time of the marriage [of] the parties herein Petitioner owned a CD in the amount of about $19,000.00 from which she thereafter expended about $4,000.00 toward a purchase of said $17,350.00 diamond ring, and said CD is presently in an amount in excess of $15,000.00.

13. During the period of the marriage, said CD has produced in excess of $10,000.00 community interest which has been unaccounted for by Petitioner, though every withdrawal therefrom was payable to Petitioner BARBARA KAY BLAKE BEARD, and no one else.[10]

14. A reasonable fee for the services of Petitioner's attorney herein that were reasonably incurred by Petitioner was the sum of $1,500.00.

### STANDARD OF REVIEW

On an appeal from a judgment rendered in a bench trial, we review the court's findings of fact in the same manner as jury findings. *See Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994); *Lucas v. Texas Dep't of Protective & Regulatory Servs.,* 949 S.W.2d 500, 502 (Tex.App.—Waco 1997, pet. denied). In such an appeal, a no-evidence or factual sufficiency challenge should be addressed to specific findings rather than the judgment as a whole. *See Northwest Park Homeowners Ass'n v. Brundrett,* 970 S.W.2d 700, 704 (Tex.App.—Amarillo 1998, pet. denied); *Levine v. Maverick County Water Control & Improvement Dist.,* 884 S.W.2d 790, 796 (Tex.App.—San Antonio 1994, writ denied).

Bramlet contends that Barbara did not properly preserve her factual sufficiency points because she did not timely file a motion for new trial. However, the documentation accompanying the motion for new trial reflects that it was deposited in the mail on the thirtieth day after judgment. Accordingly, it was timely. *See* TEX.R.CIV.P. 5, 329b(a).

When an appellant asserts that there is no evidence to support an adverse finding on which she had the burden of proof, we construe the issue as an assertion that the contrary was established as a matter of law. *See Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989); *La Grange v. Nueces County,* 989 S.W.2d 96, 99–100 (Tex.App.—Corpus Christi 1999, pet. denied); *Ex parte Thomas,* 956 S.W.2d 782, 786 n. 5 (Tex.App.—Waco 1997, no pet.). We first search the record for evidence favorable to the finding, disregarding all contrary evidence. *See Ster-*

---

**9.** Barbara expressly identifies Findings of Fact 8, 9, 10, & 11 as findings for which there is no evidence or factually insufficient evidence. The remainder of the argument in this portion of her brief addresses the substance of findings 12–14 without identifying them by their numerical designations. *See Heritage Resources, Inc. v. Nationsbank,* 895 S.W.2d 833, 837 (Tex.App.—El Paso 1995), *rev'd on other grounds,* 939 S.W.2d 118 (Tex. 1996) (lower court "discern[ed]" what findings were at issue).

**10.** The court's recitations about the CD notwithstanding, it appears that this finding actually relates to interest accrued on a separate account Barbara established at the First Na-

tional Bank of Central Texas with a substantial inheritance she received during the marriage. Bramlet testified that the inheritance account earned $10,692.70 in interest. Conversely, the record reflects that the interest earned on the CD (about $4,000) was significantly less. Bramlet's counsel compounded the confusion in his post-trial brief in which he asserted that the CD had "undisputedly produced in excess of $10,000.00 in community interest." Our interpretation of this finding garners further support from the fact that the court awarded each of the parties ½ of the "community property interest of $10,693.00" the inheritance account allegedly accrued.

*ner,* 767 S.W.2d at 690; *La Grange,* 989 S.W.2d at 100. If we find no evidence supporting the finding, we then determine whether the contrary was established as a matter of law. *Id.*

When an appellant contends that there is no evidence to support an adverse finding on which her opponent had the burden of proof, we consider only the evidence and inferences which tend to support the contested issue and disregard all evidence and inferences to the contrary. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *Tate v. Tate,* No. 08–99–006–CV, slip op. at 4, 2000 WL 1060537, at *2, —— S.W.3d ——, —— (Tex. App.—El Paso Aug. 3, 2000, no pet. h.). We will sustain such a point if: (a) there is a complete absence of evidence of a vital fact; (b) we are barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Id.* (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex. L.Rev. 361, 362–63 (1960)). "More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.' "[11] *Id.* (quoting *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995)).

We treat a factual sufficiency challenge to an adverse finding on which the appellant had the burden of proof as an assertion that the finding is against the great weight and preponderance of the evidence. *See Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983); *Tate,* No. 08–99–006–CV, slip op. at 4, 2000 WL 1060537, at *2, —— S.W.3d at ——; *Crow v. Burnett,* 951 S.W.2d 894, 897 (Tex.App.—Waco 1997, pet. denied). When such a challenge is lodged against a finding on which the opponent had the burden, it is generally denominated as a factual sufficiency issue. In either event, we must examine the entire record. *See Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996) (per curiam); *Hitzelberger v. Samedan Oil Corp.,* 948 S.W.2d 497, 503 (Tex.App.—Waco 1997, pet. denied).

Because a divorce case invokes the clear-and-convincing standard, we will set aside the challenged finding only "if the trier of fact could not reasonably find the existence of the fact to be established by clear and convincing evidence." *Spangler v. Texas Dep't of Protective & Regulatory Servs.,* 962 S.W.2d 253, 257 (Tex. App.—Waco 1998, no pet.); *accord Tate,* No. 08–99–006–CV, slip op. at 5, 2000 WL 1060537, at *2, —— S.W.3d at ——.

### APPLICATION

### 1. Issues on Which Bramlet Had Burden of Proof

Barbara's challenges of Findings of Fact Nos. 8 and 10 contest the court's findings that Bramlet had a separate property interest in the ring and the parties' residence. These are issues on which Bramlet had the burden of proof. *See Tate,* No. 08–99–006–CV, slip op. at 3, 2000 WL 1060537, at *2, —— S.W.3d at ——; *Licata v. Licata,* 11 S.W.3d 269, 273 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

Bramlet alleges in his Third Amended Petition that he used $7,000.00 in separate

11. The original quotation is from *Transportation Ins. Co. v. Moriel. See Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995) (quoting *Moriel,* 879 S.W.2d 10, 25 (Tex.1994)).

property funds to pay for a diamond ring purchased during the marriage. He alleges that he paid $5,548.00 in separate property funds in satisfaction of a home improvement loan secured for improvements to the parties' residence. In Findings of Fact Nos. 8 and 10, the court found that Bramlet has a separate property interest in the ring and a reimbursement claim against the community estate for the separate property funds he paid toward the home improvement loan.

### The Ring

Although Finding of Fact No. 9 recites the court's finding that Bramlet paid $7,000.00 in separate property funds toward the purchase of the ring, the judgment characterizes the ring as Barbara's separate property. The court did not require Barbara to reimburse Bramlet's separate estate for any funds contributed to the purchase of the ring even though the undisputed testimony is that Bramlet contributed $7,000.00 in separate property funds to the purchase of the ring. In light of the judgment, it appears that Finding of Fact No. 9 is immaterial and did not lead to the rendition of an improper judgment insofar as Barbara's asserted interest in the ring is concerned.[12]

### The Residence

Bramlet testified that they purchased a home in May 1993. At that time, they obtained a home improvement loan of $10,000.00 which was secured by a lien on the home. Bramlet alleges in his Third

Amended Petition that he paid $5,548.00 in separate property funds in satisfaction of this home improvement loan. He testified that he obtained this money from the sale of 100 shares of stock in the Salado National Bank, which he acquired before their marriage. Barbara offered no evidence to contradict this testimony. However, she contends that this testimony is insufficient to establish Bramlet's reimbursement claim because it is not supported by documentation. We disagree.

■■■■ A right of reimbursement arises when the funds of one marital estate are expended for the benefit of another.[13] *See Vallone v. Vallone*, 644 S.W.2d 455, 459 (Tex.1982); *see also In re Marriage of Gill*, 41 S.W.3d 255, 257–58 (Tex.App.—Waco 2001, no pet. h.); *Rusk v. Rusk*, 5 S.W.3d 299, 309 (Tex.App.—Houston [14th Dist.] 1999, pet. denied); *Kimsey v. Kimsey*, 965 S.W.2d 690, 700 (Tex.App.—El Paso 1998, pet. denied). In evaluating such a claim, the fact finder must offset the enhancement value to the benefitted estate against any benefits returned to the paying estate. *See Penick v. Penick*, 783 S.W.2d 194, 197–98 (Tex.1988); *Rusk*, 5 S.W.3d at 310; *Kimsey*, 965 S.W.2d at 700; *see also Gill*, 41 S.W.3d at 258 (applying statutory reimbursement claim under sections 3.401 and 3.402 of Family Code). The court has broad discretion in evaluating this equitable claim. *See Penick*, 783 S.W.2d at 198; *Kimsey*, 965 S.W.2d at 700.

■■■■ The party claiming a right of reimbursement bears the burden of prov-

---

12. Bramlet does not challenge the court's failure to award his separate estate an interest in the ring or to require reimbursement.

13. The reimbursements at issue in this case are governed by the common law. In 1999, however, the legislature amended the Family Code to provide for the creation of an "equitable interest" of the community estate in a separate property asset or of the separate

estate in a community asset to the extent the contributing estate has enhanced the value of the benefitted estate. *See* TEX. FAM.CODE ANN. §§ 3.401–3.406 (Vernon Supp.2001). These provisions apply to any divorce proceeding pending on or after September 1, 1999. *See* Act of May 26, 1999, 76th Leg., R.S., ch. 692, § 5(c), 1999 Tex. Gen. Laws 3292, 3295.

ing that expenditures were made which are reimbursable. *See Vallone,* 644 S.W.2d at 459; *Gill,* 41 S.W.3d at 258; *Rusk,* 5 S.W.3d at 310; *Kimsey,* 965 S.W.2d at 700. Thus, the claimant must establish the extent to which the enhancement value realized by the benefitted estate exceeds those benefits received in return by the contributing estate. *See Zieba v. Martin,* 928 S.W.2d 782, 788–89 (Tex. App.—Houston [14th Dist.] 1996, no writ); *Gutierrez v. Gutierrez,* 791 S.W.2d 659, 665 (Tex.App.—San Antonio 1990, no writ).

▇▇▇ The benefitted estate is enhanced by the payment of purchase-money debt to the extent the principal indebtedness is reduced. *See Penick,* 783 S.W.2d at 197; *Graham v. Graham,* 836 S.W.2d 308, 310 (Tex.App.—Texarkana 1992, no writ). When payments are made toward a loan for improvements, enhancement can be measured by the extent to which the principal indebtedness is reduced and/or the extent to which the improvements have increased the market value of the property. *See Magill v. Magill,* 816 S.W.2d 530, 534–35 (Tex.App.—Houston [1st Dist.] 1991, writ denied). In determining the extent to which the contributing estate has received offsetting benefits, the court may consider such things as rental income and tax benefits realized by the contributing estate. *See Penick,* 783 S.W.2d at 197–98; *Rusk,* 5 S.W.3d at 310.

Bramlet testified that he expended $5,548.00 in separate property funds to pay the home improvement loan. However, he offered no evidence regarding whether all or part of these funds were applied to reduction of the principal indebtedness. According to Bramlet, they "moved some walls around, repainted, refinished hardwood floors, put in new flooring, new carpet, just numerous things" with the proceeds from the home improvement loan. He testified that these improvements en-

hanced the value of the home by at least the amount ($10,000.00) expended. The record further reflects that the parties purchased the home for $145,000.00 in 1993 and it was worth $155,000.00 at the time of trial.

▇▇▇ From this evidence, we cannot say that the court "could not reasonably find ... by clear and convincing evidence" that the value of the home was enhanced by the $5,548.00 in separate property funds which Bramlet paid toward the home improvement loan. *See Tate,* No. 08–99–006–CV, slip op. at 5, 2000 WL 1060537, at \*2, —— S.W.3d at ——; *Spangler,* 962 S.W.2d at 257. Accordingly, we conclude that the record contains some evidence and factually sufficient evidence to support the court's finding that Bramlet enhanced the valued of the parties' residence with the $5,548.00 in separate property funds he used to pay the home improvement loan.

### 2. Issues on Which Barbara Had Burden of Proof

▇▇▇ Barbara's complaints regarding Findings of Fact Nos. 9 and 12 attack the court's findings regarding the extent of her alleged separate property interests in the ring and a certificate of deposit issued by the Ennis State Bank. Her challenge to Finding of Fact No. 11 contests the court's decision not to reimburse the community estate for funds expended for a condominium which was Bramlet's separate property. Her complaint regarding Finding of Fact No. 13 challenges the court's determination that she failed to account for approximately $11,000.00 in interest allegedly accrued from a substantial inheritance she received during the marriage. Her attack on Finding of Fact No. 14 complains of the court's determination of those attorney's fees which she "reasonably incurred." These are issues on which Barbara had the burden of proof. *See Stewart Title Guar.*

*Co. v. Sterling,* 822 S.W.2d 1, 10 (Tex.1991) (attorney's fees); *Jensen v. Jensen,* 665 S.W.2d 107, 110 (Tex.1984) (reimbursement); *Tate,* No. 08–99–006–CV, slip op. at 3, 2000 WL 1060537, at *2, — S.W.3d at —— (separate property); *McCann v. McCann,* 22 S.W.3d 21, 23 (Tex.App.—Houston [14th Dist.] 2000, pet. denied) (reimbursement); *Hartmann v. Solbrig,* 12 S.W.3d 587, 594 (Tex.App.—San Antonio 2000, pet. denied) (attorney's fees); *Licata,* 11 S.W.3d at 273 (separate property).

### The Ring

Barbara's complaint regarding Findings of Fact Nos. 8 and 9 attacks the court's implied findings that her separate estate contributed only $4,350.00 toward the purchase of the ring.[14] However, the judgment recites that the ring is Barbara's separate property. In light of the judgment, it appears that Finding of Fact No. 9 is immaterial and did not lead to the rendition of an improper judgment insofar as Barbara's asserted interest in the ring is concerned.

### The Certificate of Deposit

Barbara's challenge regarding Finding of Fact No. 12 contests the court's finding regarding the extent of her separate property interest in a certificate of deposit at Ennis State Bank. Her seventh issue in part attacks the court's alleged failure to award her all the funds which she owned prior to marriage and applied to the purchase of a CD at this bank. Her twelfth issue questions the court's failure to find that Bramlet breached a fiduciary duty he owed her as husband and officer of the bank which issued these CD's.

 Barbara testified that she placed $19,000 in a CD at the bank before their marriage in April 1990. She withdrew $7,384 in August 1990. According to other testimony, she applied at least a portion of this withdrawal ($4,350) to the purchase of the ring. A series of other renewals, deposits, and withdrawals reduced the principal balance of Barbara's separate property funds to $10,000.00, which was applied to the purchase of another CD on August 17, 1990. Because these transactions involved commingled funds (principal belonging to Barbara's separate property estate and interest to the community estate), we presume that Barbara withdrew community funds first in the absence of proof to the contrary. *See Smith v. Smith,* 22 S.W.3d 140, 146 (Tex.App.—Houston [14th Dist.] 2000, no pet.).

The only contrary proof in the record is that Barbara expended $4,350.00 in separate property funds for the ring. Thus, we presume that the remainder of the withdrawals from these CD's consumed all the interest earned by the community estate to date in addition to a significant portion of Barbara's separate property estate. Because we presume community funds were withdrawn first from this commingled account, we conclude that the $10,000.00 principal balance of the August 1990 CD was Barbara's separate property.

 We likewise presume that one-half of that portion of the prior withdrawals attributable to Barbara's separate property and not otherwise accounted for ($4,650.00) was a gift to the community. *See Cockerham v. Cockerham,* 527 S.W.2d 162, 168 (Tex.1975); *Bahr v. Kohr,* 980 S.W.2d 723, 726 (Tex.App.—San Antonio 1998, no pet.); *In re Marriage of Thur-*

---

**14.** In Finding of Fact No. 8, the Court found that Bramlet's separate estate contributed $7,000.00 toward the purchase of the $17,350.00 ring and the community estate contributed $6,000.00.

*mond,* 888 S.W.2d 269, 273 (Tex.App.— Amarillo 1994, writ denied).

Barbara placed the principal and interest from her August 1990 CD into two separate CD's on March 1, 1991: one with a principal balance of $6,000.00 and one of $4,382.44.[15] $382.44 of the latter CD was community property as it was derived from interest accrued on the $10,000.00 CD issued in August 1990. Barbara renewed the $6,000 CD three times before she deposited its principal balance in a money market account on May 29, 1992.[16]

 The Bank issued a separate CD payable to Barbara on September 19, 1990 in the principal amount of $2,500.00. The record contains no evidence regarding the source of funding for this CD. Accordingly, we presume that it was a community asset. *See Cockerham,* 527 S.W.2d at 167; *In re Marriage of Parker,* 997 S.W.2d 833, 837 (Tex.App.—Texarkana 1999, pet. denied); *Scott v. Scott,* 805 S.W.2d 835, 837 (Tex. App.—Waco 1991, writ denied). After various renewals and deposits, the bank issued a CD on February 15, 1991 in the principal amount of $11,000. The record attributes $5,000.00 of these deposits to funds from an account at the former Waco State Bank, which Barbara acknowledges to be a community account. The record contains no evidence of the source of the remaining $3,372.61 in deposits made to this CD. Accordingly, we presume that the entirety of this $11,000 CD was a community asset.

On March 18, 1991, the Beards combined the principal and interest from the $11,000 community CD and Barbara's $4,382.44 CD ($382.44 of which were community funds) into a $15,454.72 CD. The

parties withdrew $454.72 from this CD, and the bank issued a $15,000 CD on April 15, 1991 payable to Barbara. Because these CD's represented commingled funds, we presume that the $454.72 withdrawal removed community funds in the absence of proof to the contrary. *See Smith,* 22 S.W.3d at 146. Thus, $4,000.00 of the $15,000.00 CD was Barbara's separate property, and the remainder community. The parties regularly renewed this CD until May 13, 1992, when they opened the money market account.

When the Beards opened the money market account with the $15,000 in proceeds from this CD, $4,000.00 of the account was Barbara's separate property, and the remainder community. Barbara deposited the proceeds from her separate property $6,000.00 CD into this account on May 29, 1992. After a series of deposits and withdrawals (all of which we presume to involve community funds), the Beards withdrew $15,000 from the money market account in November 1992 to purchase a CD. This $15,000 CD is the predecessor to the one which the parties claim to be Barbara's separate property. Accordingly, we presume that the Beards placed the entirety of Barbara's $10,000.00 separate property funds from the money market account into this CD.

After a withdrawal (which we presume to be of community funds), the bank issued a $14,500.00 CD on May 11, 1993, payable to Barbara. According to the history noted above, $10,000.00 of these funds are Barbara's separate property, and the remainder community. Nonetheless, Bramlet and Barbara both testified that the $14,500.00 principal balance of this CD is Barbara's separate property. We treat

---

15. From the endorsements on this series of eleven CD's, the two March 1991 CD's can be clearly traced back to Barbara's original $19,000 CD.

16. Bank records reflect that Bramlet and Barbara both signed the deposit agreement for this account on May 13, 1992.

this testimony as evidence that Bramlet gave the community funds in this CD ($4,500.00) to Barbara. *See In re Marriage of Morrison,* 913 S.W.2d 689, 691 (Tex.App.—Texarkana 1995, writ denied).

At the beginning of the marriage, Bramlet was a vice-president at Ennis State Bank. At the time of trial, he was president. Bank records reflect a long series of transactions relating to Barbara's CD. However, Bramlet denied ever making any unauthorized withdrawals from the CD. Barbara on the other hand testified that she did not recall making any of the withdrawals save for the one involving the purchase of her ring. Nevertheless, her signature does appear on the deposit agreement for the money market account.

■ Because the court awarded Barbara the principal balance of the CD as her separate property and one-half of the interest as her share of the community estate and because Bramlet denied that he made any unauthorized withdrawals from these funds, we conclude that the record contains some evidence to support the challenged findings and that such findings are not contrary to the great weight and preponderance of the evidence.

### The Residence

Barbara's seventh issue challenges in part the court's failure to confirm as her separate property an undivided three percent interest in the residence attributable to funds she allegedly contributed for closing costs in the purchase of the residence. Barbara's CPA testified that the parties

applied $4,905.07 from her CD to these closing costs. He cited a May 26, 1993 withdrawal in the amount of $10,264.32 which the Beards used to purchase a cashier's check payable to the title company for the closing. The payment of this check reduced the Beards' money market account to a zero balance. The CPA attributed $5,359.25 of this withdrawal to community funds on deposit in the account and the remainder ($4,905.07) to Barbara's separate property interest in the account.

However, our review above of the history of the funds deposited at the bank reflect that the Beards withdrew Barbara's community funds from the money market account in November 1992 when they purchased a $15,000.00 CD. Accordingly, the remainder of the funds on deposit in the money market account are presumptively community funds. While the CPA's testimony reads otherwise, Barbara cannot have it both ways. If the CPA's theory were given credence, Barbara's $19,000.00 in separate property funds would have inexplicably blossomed to $23,905.07.[17]

■ For these reasons, Barbara failed to rebut the statutory presumption that the funds used to pay the closing costs came from the community estate. *See Cockerham,* 527 S.W.2d at 167; *Parker,* 997 S.W.2d at 837; *Scott,* 805 S.W.2d at 837. Accordingly, we conclude that there is some evidence to support the court's failure to award Barbara's separate property estate an interest in the parties' residence and such failure is not contrary to the great weight and preponderance of the evidence.

17. As previously noted, the principal balance of Barbara's CD had decreased to the level of $10,000 in August 1990. Although Barbara claims that this happened because Bramlet made unauthorized withdrawals, we have already concluded that the court's contrary finding is not against the great weight and preponderance of the evidence. The

$23,905.00 sum · is derived by adding the clearly-established $10,000.00 principal balance of the CD in August 1990, the $4,350.00 admittedly spent on the ring in August 1990, the $4,650.00 in unexplained 1990 withdrawals, and the $4,905.07 Barbara claims to have contributed to closing costs.

## The Inheritance

The remainder of Barbara's seventh issue challenges that portion of the court's Finding of Fact No. 13 in which the court determined that she had failed to account for more than $10,000.00 in interest which allegedly accrued from the inherited funds she deposited in a bank account with the First National Bank of Central Texas.

Barbara's brother Willard served as independent executor of their grandfather's sizable estate. Willard made periodic distributions, depositing Barbara's share directly in her account. Barbara opened this account with an initial deposit of $90,759.00 in September 1996. Between December 1996 and January 1997, three deposits totaling $129,794.00 were added. An additional deposit of $9,750.00 was made in August 1997. After the parties' separation, Barbara made one deposit of her earnings from work in the amount of $1,948.12. Two days later, she withdrew this same amount and deposited it in her checking account. The bank records reflect that this account earned $8,436.65 in interest between September 1996 and September 1997.

Barbara made several purchases with the funds in this account. She purchased porcelain candlesticks, an antique chest, a set of baccarat glasses, and a sterling silver tea service from Willard for $10,829.00. She characterizes the candlesticks as wholly community property, the tea service as wholly separate property, and the remainder as mixed. Barbara also purchased a set of chairs and a painting from others for

$752.00. She characterizes these assets as primarily community property.[18]

Barbara also set aside $1,200.00 from these funds for federal income taxes and paid her attorney $36,000.00 from this account. Tracing all of these transactions through the account history, Barbara's CPA characterized the account (as of August 1997) to contain $183,046.43 in separate property funds and $2,202.47 in community funds.

Bramlet testified, based on his review of the bank records, that this account had earned $10,692.70 in interest through the end of October 1997.[19] The court found that Barbara had failed to account for the interest allegedly accrued. Accordingly, the court awarded Bramlet one-half of this stated sum as his share of the community interest in the account.

The bank records which Barbara offered in evidence clearly reflect that this account earned only $8,436.65 in interest as of September 29, 1997. The account earned $812.00 in interest in September 1997. The account balance remained relatively unchanged at the time of trial, and it defies logic to assume that the account earned an additional $2,250.00 in interest in October 1997. Bramlet proffered no additional evidence to support his assertion that the account earned $10,692.70 in interest.[20]

Conversely, Barbara identified six specific assets which were purchased with funds on deposit in this account. Her CPA classified the porcelain candlesticks, the set of chairs, and a painting as commu-

18. Barbara characterizes the painting as 100% community property, the six chairs as 98% community, the antique chest as 28% community, and the baccarat glasses as 48% community.

19. The bank records regarding this account offered in evidence by Barbara end at September 1997.

20. To the extent that Barbara's deposit of earnings could be included in the community property funds on deposit in this account, the record clearly reflects that she withdrew these earnings two days after depositing them and placed them in her checking account.

nity assets; he characterized the antique chest and the set of baccarat glasses as mixed assets; and he designated the sterling silver tea service as Barbara's separate property. It appears that the CPA made these characterizations based on the amount of community funds (accrued interest) in the account at the time each of the purchases was made. The CPA applied the traditional formula that community assets were first expended from this account to pay for these purchases. *See, e.g., Smith*, 22 S.W.3d at 146–47.

■■■ Bramlet's unsupported testimony that Barbara's inheritance account accrued $10,692.70 in interest constitutes no more than a mere scintilla of evidence to support the court's finding. *See Merrell Dow Pharms.*, 953 S.W.2d at 711; Calvert, 38 Tex. L.Rev. at 363. However, Barbara produced bank records which clearly state the interest actually earned on the account. Her CPA carefully traced the account history and noted every transaction and the purpose or source for such transaction. With this evidence, Barbara conclusively established that the community interest in this account was only $2,202.47. *See Sterner*, 767 S.W.2d at 690; *La Grange*, 989 S.W.2d at 100.

### The Condominium

Barbara's challenge to Finding of Fact No. 11 contests the court's decision not to reimburse the community estate for funds expended for a rental condominium which was Bramlet's separate property. In her eighth issue, Barbara complains in part that the court erred in failing to reimburse the community estate from Bramlet's separate estate for community funds and assets used to pay a debt on the condominium and losses sustained by the community from the condominium.

Bramlet purchased the condominium in 1983. When the Beards married, Bramlet owed $63,000.00 on a purchase money note secured by the condominium and held by Central National Bank in Waco. He also owed $4,000.00 on a separate purchase money note held by his father and his father's partner. Bramlet testified that they paid between $550.00 and $650.00 per month on the condominium debt.[21] He opined that the benefits received by the community estate from the condominium approximately equaled the amount expended on the purchase money note.

When Barbara filed the divorce petition, the balance of the $63,000.00 note had been reduced to $55,472.00, but the $4,200.00 note had increased to $7,200.00. According to Bramlet's testimony, the community estate paid approximately $50,000.00 during the marriage toward the debt on the condominium. Barbara asks that the community estate be reimbursed by the amount the balance of the Central National Bank note was reduced ($7,528.00) during the marriage.

The Beards reported losses on their 1990 to 1996 income tax returns totaling $21,301.00 from the condominium.[22] Bramlet characterizes these losses as a benefit to the community estate because they reduced the Beards' taxable income. A utilization of the applicable tax rates for these reported losses indicates that the community realized a tax benefit of

---

**21.** At least one of these notes had a variable interest rate. Based on the fact that the balance of the Central National Bank note decreased during the marriage but the other note increased, it appears that Bramlet's father did not require him to make any payments on this other note during the marriage.

**22.** The Beards also reported $14,036.00 in losses which they could not claim on their 1993 to 1995 returns. The impact of these losses is discussed hereinafter with regard to Barbara's thirteenth issue.

$7,062.00 for tax years 1990 through 1992 and for tax year 1996.[23] *See Pelzig v. Berkebile*, 931 S.W.2d 398, 401 (Tex.App.— Corpus Christi 1996, no writ).

The Beards also reported business income on their tax returns which Bramlet testified to be management fee income.[24] According to Bramlet, his tenant paid him a management fee in lieu of rent. He attributed the entirety of the business income reported on the tax returns to this management fee. The six tax returns offered in evidence reflect a total of $41,067.00 in business income.

■ In sum, the purchase-money debt payments made with community funds enhanced the value of Bramlet's separate property condominium by the amount the balance of the Central National Bank note was reduced ($7,528.00) during the marriage. *See Penick*, 783 S.W.2d at 197; *Graham*, 836 S.W.2d at 310. In return, the community received $41,067.00 in management fee income and $7,062.00 in tax savings for tax years 1990 through 1992 and for tax year 1996. These benefits to the community total $48,129.00. Conversely, the Beards reported $35,337.00 in losses from the condominium. Even taking these losses into account however, the evidence reflects that the community estate received more than $13,000.00 in benefits from Bramlet's condominium.

Given the equitable nature of a reimbursement claim and the evidence in the record, we conclude that some evidence exists to support the court's finding and such finding is not contrary to the great weight and preponderance of the evidence.

### Waste of Community Assets

The remainder of Barbara's eighth issue attacks the court's failure to reimburse the community estate from Bramlet's separate estate for community funds allegedly wasted by Bramlet in strip clubs.

Barbara discovered a questionable credit card receipt shortly before she filed the divorce petition. After it was confirmed that one of the charges on the bill had been incurred at a strip club in Arlington, Barbara hired a private investigator. When the investigator reported that Bramlet had gone to such an establishment twice the following week, she filed for divorce.

After obtaining and reviewing their financial records, Barbara was able to locate a 1991 charge of a similar nature along with several others in subsequent years.

---

**23.** We arrive at this calculation as follows. For 1990, the Beards reported a $6,128.00 loss and $102,924.00 in taxable income. In 1990, the applicable tax rate for married couples filing a joint return was 38.5% for taxable income in excess of $90,000.00. *See* Tax Reform Act of 1986, Pub.L. No. 99–514, sec. 101, § 1(h)(2)(A), 100 Stat. 2085, 2098. Thus, the Beards realized a tax savings of $2,359.00 from the reported loss (38.5% of the $6,128.00 by which their taxable income in excess of $90,000.00 was reduced). For 1991 and 1992, the Beards reported $10,495.00 in losses and more than $99,000.00 in taxable income for each year. The applicable tax rate in these years was 31% for taxable income in excess of $78,400. *See* Revenue Reconciliation Act of 1990, Pub.L. No. 101–508, sec. 11101, § 1(a), 104 Stat. 1388, 1388–403. Thus, the Beards realized tax savings of $3,253 for these years. In 1996, the Beards reported a $4,678.00 loss and $131,014.00 in taxable income. The applicable tax rate in 1996 was 31% for taxable income between $89,150.00 and $140,000.00. *See* Revenue Reconciliation Act of 1993, Pub.L. No. 103–66, sec. 13201, § 1(a), 107 Stat. 312, 457–58. Thus, the Beards realized a tax savings of $1,450.00 in 1996.

**24.** Business income reported on Internal Revenue Service Form 1040 must be explained in Schedule C. However, the tax returns offered in evidence include only the Schedules E on which the Beards reported their net losses each year on the condominium.

Bramlet testified that he went to a strip club about once per week during the last few years before trial. Based on this testimony and the records, Barbara's CPA estimated that Bramlet spent approximately $12,600.00 at such establishments. Bramlet disagreed with this estimate, though he conceded that he had "no idea" how much he had spent.

Barbara asked the court to reimburse the community estate from Bramlet's separate estate for this estimated expenditure of $12,600.00 in community funds. Bramlet countered that no reimbursement was warranted because these were reasonable expenditures, he did not spend community funds for such things as golfing, hunting, or fishing, and Barbara had herself wasted significant community funds. According to Bramlet, Barbara regularly spent $200.00 at a hair salon, she purchased two furs and two rings for approximately $11,000.00, and she regularly purchased expensive clothing and accessories. Barbara disagreed with Bramlet's testimony about the hair salon and her clothing and accessory purchases.

Given the testimony, we conclude that some evidence exists to support the court's finding and such finding is not contrary to the great weight and preponderance of the evidence.

### Attorney's Fees

Barbara's complaint regarding Finding of Fact No. 14 challenges the court's determination of those attorney's fees which she "reasonably incurred." The court found that Barbara had incurred $1,500.00 in reasonable and necessary attorney's fees.

A party has no statutory right to attorney's fees in a divorce case which does not involve a child custody determination. *See Chiles v. Chiles*, 779 S.W.2d 127, 129 (Tex.App.—Houston [14th Dist.] 1989, writ denied); *see also Pletcher v. Goetz*, 9 S.W.3d 442, 448 (Tex.App.—Fort Worth 1999, pet. denied). Rather, a court may award attorney's fees as a part of the division of the parties' marital estate. *See Murff v. Murff*, 615 S.W.2d 696, 699 (Tex. 1981) (citing *Carle v. Carle*, 149 Tex. 469, 474, 234 S.W.2d 1002, 1005 (1950)); *Pletcher*, 9 S.W.3d at 448; *Chiles*, 779 S.W.2d at 129.

Barbara's counsel testified that she had incurred $54,000.00 in attorney's fees "through the start of trial" and that, with trial expenses added, $60,000.00 was a reasonable and necessary fee. Counsel offered additional testimony that $9,000.00 would be a reasonable and necessary fee in the event of an appeal.[25] Counsel offered several justifications for these fees.

Counsel noted that Bramlet's father is a prominent McLennan County attorney and that Barbara was unable to locate a local attorney to take her case because of this. Barbara called a local attorney who testified that he had advised her brother that she should secure counsel from out of town. Her brother testified that he had spoken with several local attorneys, none of whom would take her case.

Counsel also justified the requested fees because his offices are in Austin, which resulted in increased travel expenses, because he had to come to Waco for two pretrial hearings and because of the difficulties he had in obtaining copies of the Beards' financial records from Bramlet via discovery.

---

**25.** Counsel testified that $5,000.00 would be appropriate for an appeal to this Court, $1,500.00 for filing or replying to a petition for review with the Supreme Court, and $2,500.00 if the petition were granted.

Bramlet countered with another local attorney who testified that a reasonable fee in McLennan County for a divorce involving only two primary community assets (the home and bank stock) and no children would be $1,500.00. He characterized the two pre-trial hearings as unnecessary. One of these hearings involved Bramlet's changing of the beneficiary designation on a term life insurance policy from Barbara to his children.[26] The attorney testified that such a hearing was unnecessary because Bramlet had the right to change this designation at any time. The second hearing involved Barbara's request for interim attorney's fees. The attorney testified that there would be no basis for a trial court to grant interim attorney's fees for a spouse who has separate property worth approximately $200,000.00.

Bramlet also contended that Barbara's counsel engaged in excessive and unnecessary pre-trial discovery and that most of the financial records which she contends were not timely disclosed were in her possession all along.

▆▆▆ Given this testimony and the equitable nature of an attorney's fee award in a divorce case, we conclude that some evidence exists to support the court's finding on reasonable and necessary attorney's fees and such finding is not contrary to the great weight and preponderance of the evidence.

### SUMMARY

We have determined that the record contains more than a scintilla of evidence to support the court's findings that: (1) Bramlet was entitled to reimbursement for the $5,548.00 in separate property funds he expended on the home improvement loan; (2) Barbara does not have a separate property interest in the residence; (3) the principal balance of the CD belongs to Barbara and the interest to the community; (4) Bramlet did not breach any fiduciary duty to Barbara as her husband or bank officer; (5) the community estate is not entitled to reimbursement for the funds expended on the condominium purchase-money loan; (6) the community estate is not entitled to reimbursement for the funds which Bramlet expended at strip clubs; and (7) Barbara reasonably incurred $1,500.00 in attorney's fees. Neither are such findings contrary to the great weight and preponderance of the evidence.

Conversely, we have determined that the court's finding regarding Bramlet's separate property interest in the ring is immaterial, that no more than a mere scintilla of evidence exists to support the court's finding that Barbara's inheritance account had earned $10,693.00 in interest for which she had failed to account, and that Barbara's evidence conclusively established that the community interest in this account was only $2,202.47.

Accordingly, we overrule Barbara's eighth, ninth, and twelfth issues. We overrule her third and seventh issues in part and sustain them in part. We do not reach that portion of Barbara's fourth issue which challenges the factual sufficiency of the evidence to support the court's finding on the interest earned by the inheritance account. We overrule the remainder of the fourth issue.

### JUST AND RIGHT DIVISION

Barbara's tenth, eleventh, thirteenth, and fourteenth issues challenge the manner in which the court divided the commu-

---

**26.** This hearing was held on Bramlet's motion. According to the testimony, Bramlet filed the motion because Barbara would not consent to the change in beneficiaries.

nity estate. She contends that she is entitled to a disproportionate share of the community estate "up to and including sixty-five percent" and that the court abused its discretion by purportedly giving the parties each a fifty percent share. Barbara avers that the court's division of the community estate in fact resulted in Bramlet receiving 61 percent of the assets and 43 percent of the liabilities while she received only 39 percent of the assets and 57 percent of the liabilities. Bramlet disputes these figures.[27]

 Section 7.001 of the Family Code requires a divorce court to divide the community estate "in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage." TEX. FAM.CODE ANN. § 7.001 (Vernon 1998). A trial court has broad discretion in dividing the community estate. *See Schlueter v. Schlueter*, 975 S.W.2d 584, 589 (Tex.1998); *Murff*, 615 S.W.2d at 698; *Dutton v. Dutton*, 18 S.W.3d 849, 852 (Tex.App.—Eastland 2000, pet. denied). The court exercises this discretion by considering many factors, including but not limited to:

> the spouses' capacities and abilities, benefits which the party not at fault would have derived from continuation of the marriage, business opportunities, education, relative physical conditions, relative financial condition [sic] and obligations, disparity of ages, size of separate estates, [ ] the nature of the prop-

erty .... [and] a disparity in earning capacities or of incomes....

*Murff*, 615 S.W.2d at 699; *accord Walston v. Walston*, 971 S.W.2d 687, 691 (Tex. App.—Waco 1998, pet. denied). The court may also consider whether one of the parties to the marriage has wasted community assets. *See Schlueter*, 975 S.W.2d at 589.

We review the court's division of the community estate under an abuse-of-discretion standard. *See Murff*, 615 S.W.2d at 698; *Walston*, 971 S.W.2d at 691; *Dutton*, 18 S.W.3d at 852. We will not disturb such a determination unless "the trial court acted without reference to guiding rules or principles such that the court's division of community property was arbitrary and unreasonable." *Walston*, 971 S.W.2d at 691; *accord Dutton*, 18 S.W.3d at 852.

 Barbara claims in her fourteenth issue that the court abused its discretion by dividing the community estate in a manner significantly different than that indicated in a series of "letter rulings" mailed to the parties by Judge Douglas between November 1997 and January 1998. However, a pre-judgment letter does not constitute competent evidence of the court's ultimate decision. *See Cherokee Water Co. v. Gregg County Appraisal Dist.*, 801 S.W.2d 872, 878 (Tex.1990); *Maddox v. Cosper*, 25 S.W.3d 767, 771 n. 5 (Tex.App.—Waco 2000, no pet.). Accordingly, we overrule her fourteenth issue.

---

27. Barbara provides both percentages and numbers. She contends that Bramlet received $38,257.50 (61%) of community assets and $9,248.38 (43%) of community liabilities, while she received $25,202.37(39%) of assets and $12,248.51 (57%) of liabilities. She calculates that Bramlet received $29,009.12 (70%) of the net community estate, while she received $12,953.86 (30%). Bramlet disputes these figures, concluding that he received $24,839.93 (48%) of the net community estate, while Barbara received $26,546.15 (52%). These disparities are largely explained by: Bramlet's reduction of the value of the 401(k) accounts by estimated tax liabilities on those funds; Bramlet's crediting to Barbara of $7,018.00 for one-half of the passive activity loss carryover on his condominium; and Bramlet's deletion from Barbara's liabilities of $3,000.13 on a Visa account which he contends Barbara accumulated after the parties' separation.

Barbara's tenth, eleventh, and thirteenth issues challenge the court's exercise of discretion on several fronts. She contends that she is entitled to a disproportionately greater share of the community estate than Bramlet because of: (1) the community funds she alleges were expended to enhance the value of Bramlet's condominium; (2) her separate property funds in the CD which she claims Bramlet improperly withdrew for the closing costs on their home, as security for their purchase of bank stock,[28] to pay income taxes, and for other unknown reasons; (3) the community funds Bramlet spent at strip clubs; (4) her separate property funds used for attorney's fees; and (5) Bramlet's sale of a tract of separate property at a loss of $4,328.00, which loss the community estate bore.

We have already concluded that the record contains more than a scintilla of evidence that: the community estate received benefits from Bramlet's condominium property at least equal to those expended on the condominium; Barbara's CD funds have been substantially accounted for; the community funds Bramlet spent at strip clubs were offset by the funds Barbara spent at the hair salon and for clothing and accessories; and that Barbara incurred only $1,500.00 in reasonable and necessary attorney's fees. Because of this, we cannot say that Barbara's first four complaints demonstrate an abuse of discretion.

Regarding the fifth complaint, the record shows that Bramlet owned another piece of property located at 4102 Green Point Drive in Waco as his separate property. He sold this property at a loss during the marriage and the community estate paid the $4,328.00 debt still owed on this property. The court ordered Bramlet to reimburse Barbara with $2,164.00 to compensate her for this community loss. Thus, the court did account for this loss in its decree.

Barbara specifically alleges in her thirteenth issue that the court abused its discretion in dividing the community estate because the court: (1) failed to consider "the valuation of personalty and character of the personalty awarded to the respective parties"; (2) set aside the funds in a community account to Bramlet without requiring him to prove the amount of funds on deposit in the account; (3) awarded the parties the balances of their respective 401(k) accounts even though Bramlet has three-times more funds on deposit in his 401(k) account than she; (4) ordered her to pay one-half of a $9,500.00 credit card debt which Bramlet did not disclose during pretrial discovery; (5) ordered her to pay one-half of the ad valorem taxes on the residence even though the court had previously ordered Bramlet to place sufficient funds in escrow to satisfy this obligation up to the entry of a final decree; and (6) set aside one-half of a passive activity loss carryover on Bramlet's condominium to her.

■ Barbara does not clarify in what manner the court failed to consider "the valuation of personalty and character of the personalty awarded to the respective parties." We will not make this argument for her. *See Mesa Operating Co. v. California Union Ins. Co.*, 986 S.W.2d 749, 757 n. 5 (Tex.App.—Dallas 1999, pet. denied); TEX.R.APP.P. 38.1(h).

Barbara complains that the court abused its discretion by awarding Bramlet the entirety of a particular checking account without requiring him to prove the amount of funds on deposit in the account. In the decree, the court awarded to each of the

---

**28.** Barbara signed an assignment pledging her CD as collateral for the purchase of the bank stock. She testified that she agreed to this transaction.

parties those bank accounts under each party's sole management and control. Thus, the court awarded to Bramlet two checking accounts at Ennis State Bank, a savings account at that bank, a checking account at Fidelity Bank of Texas, and a checking account at Central National Bank of Waco. The court awarded to Barbara a checking account at Fidelity Bank of Texas and one at First National Bank of Central Texas. The only evidence in the record regarding the balances of any of these accounts is found in Barbara's inventory and appraisement which indicates that her Fidelity Bank checking account had a zero balance at the time of trial and the First National Bank checking account had a balance of $3,317.16.

Although the court awarded Bramlet five bank accounts without evidence of the amounts on deposit in any of them, Barbara complains only about a checking account at Ennis State Bank under the name "Bramlet F. Beard Expense Account." Barbara notes in her brief that Bramlet offered no evidence of the amounts on deposit in these accounts but focuses on the "expense account" because she contends that Bramlet did not disclose its existence in pre-trial discovery. Bramlet counters that the account was overdrawn by $167.28 in June 1997 and that he disclosed the existence of the account and its overdrawn balance in his inventory and appraisement. Bramlet did not file this inventory and appraisement but referenced it in his discovery responses. Barbara does not dispute these assertions in her reply brief.

■ Given that Barbara complains of only one of the five accounts the court awarded Bramlet even though he offered no evidence of any of their balances and considering the fact that the court award-

ed to each of the parties those accounts under his or her separate management and control, we cannot say that "the trial court acted without reference to guiding rules or principles such that the court's division of [the bank accounts] was arbitrary and unreasonable." *Walston*, 971 S.W.2d at 691; *accord Dutton*, 18 S.W.3d at 852.

■ Barbara avers that the court abused its discretion by awarding to each of the parties their 401(k) accounts without making adjustments for disparities in the balances of these accounts. According to the record, the balance of Bramlet's 401(k) account was $23,226.53, while the balance of Barbara's was $7,874.86. Bramlet responds that any disparities in the balances of these accounts is largely offset by the fact that the court awarded Barbara the Beards' only car, valued at $11,500.00.[29] Again, no abuse of discretion is shown.

■ Barbara claims that the court abused its discretion by requiring her to pay one-half of the $9,500.00 owed on a Visa account held in Bramlet's name because "that debt was never disclosed by [Bramlet] prior to the close of evidence in this case and [she] was deprived of discovery relating to the source and amount of this debt." Regardless of this assertion however, Barbara's September 1997 response to Bramlet's request for production identifies this particular account and provided copies of seven statements from March 1994 to July 1995 on this account. At trial, she offered the March 1997 statement for this account and cross-examined Bramlet about a strip-club expenditure reflected thereon. Because Barbara identified this particular account in pretrial discovery, she cannot now argue that she was deprived discovery regarding the charges incurred on this account.

---

29. Bramlet drives a car furnished by his employer.

Barbara argues that the court abused its discretion by ordering her to pay one-half of the 1997 ad valorem taxes on the residence even though the court had previously ordered Bramlet to place sufficient funds in escrow to satisfy this obligation. When Barbara filed her divorce petition, she requested temporary orders awarding her possession of the residence pending a final decree and requiring Bramlet "to pay certain existing community liabilities during the pendency of this suit."

The court heard Barbara's request for temporary orders in September 1997. No written temporary orders appear in the record. Instead, Barbara filed a partial reporter's record from the hearing. From this brief transcript, it appears that the court ordered Bramlet to make the house payments and keep the property taxes current pending a final decree. Barbara's counsel asked the court to clarify whether it was ordering Bramlet to escrow sufficient funds to cover the taxes. The court responded:

> I don't care as long as there is money there to cover it for, you know, the pay off. If he's going to hold that money or be responsible for it at final division or whatnot. As long as the taxes aren't coming due, he's responsible for them at the rate of $242.00 a month until the separation. Now, you know, it'll come out of his-if he doesn't have to pay it, nobody's looking for it, it will come out at the division or whatnot. Okay? All right.

From our reading of this "order," the court did not clearly direct Bramlet to escrow these funds. Rather, it appears that the court intended that Bramlet be responsible for the ad valorem taxes up to the date of separation (June 1997) and that he pay this amount when these taxes became due. Conversely, if the final decree issued before the taxes became due, it appears that the court intended to apportion the ad valorem taxes in the final decree.

■ Regardless of the terms of this "order," such directive is interlocutory in character. *See* TEX. FAM.CODE ANN. § 6.507 (Vernon 1998). Because a court has broad discretion to issue such orders even on its own motion, we likewise presume that the court has ample authority to modify such orders. *Cf. Morgan v. Morgan,* 657 S.W.2d 484, 493–94 (Tex. App.—Houston [1st Dist.] 1983, writ dism'd) (court has "broad discretion" to issue temporary orders in divorce action). Moreover, because the Family Code has a separate provision for the issuance of temporary orders pending appeal, we presume that temporary orders issued under section 6.507 are supplanted by the terms of the final decree. *Cf.* TEX. FAM.CODE ANN. § 6.709 (Vernon 1998) (temporary orders during appeal).

■ Because of the uncertainty of the court's temporary "orders" and because of the interlocutory character of such orders, we cannot say that the court abused its discretion by dividing the ad valorem taxes equally between Barbara and Bramlet.

The last contention in Barbara's thirteenth issue is that the court abused its discretion by awarding her one-half of a $14,036.00 passive activity loss carryover from Bramlet's condominium because such a loss can be applied against only future passive activity gross income. Because she has no ownership interest in the condominium and engages in no other passive activities, she contends that this loss carryover is worthless to her.

Section 469 of the Internal Revenue Code prescribes the treatment of passive activity losses. *See* I.R.C. § 469 (West Supp.2000). The ownership of rental property is generally considered to be a

passive activity.[30] *Id.* § 469(c)(2). The term "passive activity loss" means the amount by which aggregate losses from passive activities in a particular tax year exceed aggregate income from passive activities in that year. *Id.* § 469(d)(1). Any passive activity loss realized in a particular tax year must be carried forward as a deduction allocable to passive activities in the next year. *Id.* § 469(b).

However, section 469(i) provides for a $25,000.00 offset for rental activities in which the taxpayer and/or his spouse actively participated.[31] *Id.* § 469(i). This provision excepts $25,000.00 of passive activity losses from the disallowance of section 469(a) and permits such losses to be offset against nonpassive income. *Id.;* 26 C.F.R. § 1.469–9(j). However, this offset is further limited to the extent that a taxpayer's adjusted gross income exceeds $100,000.00. *See* I.R.C. § 469(i)(3)(A).[32] Specifically, the offset is reduced by fifty percent of the amount by which a taxpayer's adjusted gross income exceeds $100,000.00. *Id.*

The $14,036.00 in passive activity losses at issue accumulated from 1993 to 1995. In 1996, the Beards reported a net loss from the condominium of $4,678.00. Thus, they could not offset any of the passive activity losses from prior years. Additionally, because their adjusted gross income in each of these years exceeded $150,000.00, they could not take advantage of the $25,000.00 offset.[33]

In 1997 however, the Beards were considered single persons for tax purposes because the court orally pronounced them divorced at the conclusion of the trial. *See In re Marriage of Wilburn,* 18 S.W.3d 837, 840–41 (Tex.App.—Tyler 2000, pet. denied); *see also Boyer v. Commissioner,* 732 F.2d 191, 194 (D.C.Cir. 1984) (per curiam) (state law determines marital status of parties for federal tax purposes); I.R.C. § 7703 (West 1989) (defining how marital status is determined for federal tax purposes). The testimony reflects that neither of the parties had adjusted gross income in excess of $100,000.00 in 1997. Thus, they could both fully utilize the $25,000.00 offset when they filed their 1997 tax returns. For this reason, it appears that Barbara could fully deduct the $7,018.00 passive activity loss carryover deduction against her nonpassive income in 1997. Therefore, we cannot say that the court abused its discretion by awarding Barbara one-half of the $14,036.00 passive activity loss carryover from Bramlet's condominium.

For the reasons stated, we cannot say that "the trial court acted without reference to guiding rules or principles such that the court's division of community property was arbitrary and unreasonable." *Walston,* 971 S.W.2d at 691; *accord Dut-*

---

**30.** A taxpayer's ownership of rental property is not considered to be a passive activity if more than one-half of the taxpayer's services are devoted to the business of real estate and the taxpayer performs more than 750 hours of work in this business (*i.e.,* the taxpayer is engaged primarily in the business of real estate development, construction, sales, rental, or management). *See* I.R.C. § 469(c)(2), (7) (West Supp.2000).

**31.** Because Bramlet is the sole owner of the condominium, we presume that he actively participated in its operation.

**32.** This $100,000.00 figure is halved for married persons filing separate returns, as is the $25,000.00 offset. *See* I.R.C. § 469(i)(5)(A) (West Supp.2000).

**33.** This is so because the $25,000 offset is reduced by fifty percent of the adjusted gross income in excess of $100,000.00. *Id.* § 469(i)(3)(A) (West Supp.2000). Thus, when a married couple's adjusted gross income reaches $150,000.00, the $25,000.00 offset is completely eliminated.

*ton,* 18 S.W.3d at 852. Accordingly, we overrule Barbara's tenth, eleventh, and thirteenth issues.

## THE BANK STOCK

Barbara contends in her fifteenth issue that the court abused its discretion by failing to award the parties each a one-half undivided interest in the shares of bank stock they purchased during their marriage and appoint a trustee to make distributions, pay the debt secured by the stock, and hold the stock in trust until the parties mutually agree to a disposition of all or part of the shares.

The record reflects that Bramlet's father owns a significant interest in the two banks at issue. His business partner and he own more than fifty percent of the stock in Oglesby State Bank, but less than fifty percent of the stock in the First National Bank of McGregor. Bramlet and Barbara acquired a fifteen percent share of stock in the Oglesby bank and less than a three percent share of stock in the McGregor bank. Barbara presented testimony from a local bank officer that Bramlet could ally his shares with those of his father's in such a manner that they could arrange for a sale of these banks under terms that the buyer not purchase Barbara's shares and not pay dividends on her shares.

However, this witness also testified that no prospective buyers had emerged for either of these small-town banks in the past twenty years and none were anticipated in the foreseeable future. In his personal dealings with Bramlet's father, he had never found him to treat minority shareholders unfairly. Bramlet testified that placing their bank stock in trust would unduly complicate their ownership interests. He further noted that laws exist to protect the interests of minority shareholders.

The court rejected Barbara's request that each party be awarded an undivided one-half interest in the stock and appoint a trustee to protect her interest. Instead the court ordered a partition in-kind.

From the testimony, we cannot say that the court's refusal to award each of the parties an undivided one-half interest in their shares of bank stock and appoint a trustee to hold these shares was arbitrary or unreasonable. *See id.* Accordingly, we overrule Barbara's fifteenth issue.

## APPOINTMENT OF RECEIVER

Barbara argues in her sixteenth issue that the court abused its discretion by appointing a receiver to sell the residence to the highest bidder. However, after Barbara perfected this appeal, the holder of the purchase money note on the residence declared a default on the note and foreclosed on the property under the terms of the deed of trust. Thus, we overrule Barbara's sixteenth issue as moot.

## CONCLUSION

We have determined that no more than a mere scintilla of evidence exists to support the court's finding that Barbara's inheritance account had earned $10,693.00 in interest. Accordingly, the court erred in awarding Bramlet $5,346.50 as his share of the community property interest in this account. Rather, the evidence conclusively establishes that only $2,202.47 of the funds in this account belonged to the community estate. For this reason, we modify the judgment to reflect that Bramlet receives $1,101.23 as his share of the community property interest in this account and that the remainder of the funds on deposit in this account belong to Barbara. We affirm the judgment as modified.

## OPINION DENYING REHEARING

One of the grounds raised in Barbara Beard's motion for rehearing concerns our treatment of her sixteenth issue. In this issue, Barbara challenged the court's appointment of a receiver to sell the marital residence. We overruled this issue as moot because, in our words, "after Barbara perfected this appeal, the holder of the purchase money note on the residence declared a default on the note and foreclosed on the property under the terms of the deed of trust."

Barbara does not disagree with our conclusion that this issue was rendered moot by the sale of the residence at foreclosure. However, she advises that another lawsuit is currently pending regarding the propriety of the foreclosure proceedings. According to Barbara, this other litigation directly implicates the issues of who was the lawful "holder" of the note and whether the foreclosure was conducted in accordance with the terms of the deed of trust. We understand her concern to be that our language could be construed as an adjudication of the issues raised in the litigation concerning the propriety of the foreclosure proceedings.

Accordingly, we note that the above-quoted language from our opinion shall not be construed as an adjudication of the propriety of the foreclosure proceedings. With this clarification, we deny the motion for rehearing.