

# NUMBER 13-24-00222-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

## IN THE MATTER OF THE MARRIAGE OF
## KATELYN JAROSZEWSKI AND JARED JAROSZEWSKI
## AND IN THE INTEREST OF F.J., H.J., AND J.J., CHILDREN

---

## ON APPEAL FROM THE 2ND 25TH DISTRICT COURT
## OF LAVACA COUNTY, TEXAS

---

# MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices Cron and Fonseca**
**Memorandum Opinion by Justice Fonseca**

This is an appeal of a final decree of divorce between appellant Jared Jaroszewski and appellee Katelyn Jaroszewski. By three issues, Jared argues: (1) the trial court abused its discretion by awarding a disproportionate share of the community estate to Katelyn; (2) the trial court abused its discretion by entering a modified standard visitation order; and (3) he was deprived of his right to a fair trial because the trial court was not impartial. We affirm.

## I. BACKGROUND

The parties were married in 2014 and had three children together: F.J., born in 2015; H.J., born in 2017, and J.J., born in 2020. Katelyn filed her original petition for divorce in 2021, and Jared filed a counterpetition. In these pleadings, the parties requested that they both be named joint managing conservators of the children, and they each requested the right to designate the children's primary residence. In his counterpetition, Jared asked to be awarded a disproportionate share of the community estate due to Katelyn's adultery and "fault in the breakup of the marriage."

### A. Pre-Trial Proceedings

The trial court signed agreed temporary orders prescribing a 50/50 schedule for possession of the children during the pendency of the case. Pursuant to the agreed temporary orders, both parties remained living in the family residence in Shiner, but Katelyn was entitled to "exclusive use of the main bedroom and main bathroom," though Jared was "permitted to remove his clothing from the parties' shared closet as necessary."

Katelyn filed a first amended petition on February 25, 2022, stating that she "believes that [she] and [Jared] will enter into a written agreement containing provisions for conservatorship of, possession of, access to, and support of the children" and asking the trial court to render judgment on the anticipated agreement. The amended petition further stated that, because Jared "has a history or pattern of consuming too much alcohol," his visitation with the children should be supervised, or in the alternative, he should be required to submit to regular Soberlink alcohol testing[1] during his periods of

---

[1] Soberlink is an online alcohol monitoring system that automatically sends breathalyzer results to designated individuals. *See* SOBERLINK, https://www.soberlink.com/faqs (last visited Oct. 15, 2025).

possession. Finally, Katelyn's amended petition requested that she be awarded a disproportionate share of the community estate for various reasons, including "fault in the breakup of the marriage" and "wasting of community assets."

In 2022, Katelyn moved to modify the temporary orders. At a hearing on June 2, 2022, she testified that Jared "has called [her] a fucking bitch countless times in front of the kids" and that the family's living situation has become "incredibly unhealthy" because of his mood swings. She said J.J. "has made several comments about how it makes him upset" and H.J. "is wondering why daddy always makes everyone cry." According to Katelyn, because Jared "won't respect" the temporary orders, she needs to lock the door to her bedroom, which also prevents the children from coming in. She also accused Jared of disabling the alarm system at the house, noting that he leaves the door unlocked when he goes out and "comes back at random times in the middle of the night."

Katelyn further stated that, when she returned from a work trip two weeks before trial, she observed blood and semen on sheets and a towel in her bedroom.[2] She denied telling Jared he could use the master bedroom when she was not home. Following the hearing, the temporary orders were modified to grant Katelyn exclusive use of the entire residence, though the 50/50 possession arrangement remained in place. The trial court also required both parties to submit to regular Soberlink testing, and it ordered a custody evaluation to be performed by Dina Trevino, Ph.D., a licensed psychologist.

Katelyn later filed two additional amended petitions, including a fourth amended petition on November 21, 2023, which alleged for the first time that Jared committed

---

[2] Katelyn took a cell phone video recording of her discovery, and the video was entered into evidence.

3

adultery and "is guilty of cruel treatment toward [Katelyn] that renders further living together insupportable."

## B.    Trial Testimony

### 1.    Katelyn

At the final bench trial, which began on November 30, 2023, the trial court took judicial notice of the testimony given at prior hearings. Katelyn testified that Jared had "adulterous relationships" with more than one woman during the marriage, and that he also "tried to have sex" with her sister. As a result of the latter incident, the couple attended counseling in 2015 where, according to Katelyn, Jared reported that he had a "binge drinking problem" and "was allergic to whiskey." On one occasion, when the parties were transferring possession of the children, Jared screamed at her, "forced the kids into his car," and then "ran over the cat and told the kids that it was [Katelyn's] fault that he ran over the cat." She said the children were "all hysterical" at the time.

Katelyn testified that, during the time the original temporary orders were in place, Jared "drank seven days a week," and "would drink from the second he got home from work until he passed out on the couch." With her cell phone, she took a video recording of Jared sleeping on the couch and holding a wine glass during his period of possession of J.J., and the recording was entered into evidence. She also took pictures of alcohol containers placed around the house by Jared, including during his periods of possession.[3] She said there were many times during the marriage when Jared insisted on driving, but "[w]ithin seconds of being in the car, he would pass out because he was so drunk." He

---

[3] She conceded on cross-examination that she did not have any videos of Jared "actively consuming alcohol" or "actively engag[ing] in drunken behavior."

would often "sleep in the car all night long." Another time, he vomited in the bedroom closet and slept there. Yet another time, Katelyn observed Jared passed out in the backyard while he was supposed to be taking care of J.J., who was then a toddler; the backyard has a large swimming pool and Katelyn said the child was in danger of drowning. Katelyn said that Jared would drink and drive with the kids, and when she confronted him about it, he said "his lawyer told him it was okay."

According to Katelyn, on February 16, 2022, she was getting the older children ready for school when she noticed Jared did not come home the night before. She took J.J. in the car and drove around town trying to find him; eventually, she found him at the neighbor's house. She said there were "margarita cans" and a whiskey bottle on the ground, but Jared denied drinking, although he admitted he "had a girl come over." Katelyn explained that Jared was required to submit to Soberlink testing at 9:00 a.m., 2:00 p.m., and 9:00 p.m., but "[o]ne drink stays in your system for [only] one hour," so it would not be necessarily effective to detect Jared's drinking after 9:00 at night.

After reading Trevino's custody evaluation report, Katelyn opined that Jared "lied to [Trevino] about everything," including his drinking and how he treats her and the children. She further said that, when J.J. had a yeast infection during one of Jared's weekends of possession, he was supposed to apply medication to the child but refused to do so. She conceded that Jared takes the children to church regularly, is "very involved in their extracurricular activities," "keeps them well fed," and has never hit them.

Katelyn denied having an emotional or sexual relationship with any other person during the marriage. She explained that she has a male friend, JT, with whom she had a sexual relationship before her marriage to Jared. In 2021, she was "sitting and working in

5

[her] car" in front of an HEB when JT came to "say hi" and sat in the passenger's seat. According to Katelyn, after a short time, she saw Jared's truck pull up alongside her car; Jared then started "punching" and "kick[ing]" JT in the children's presence, which was "traumatizing" for them.

Katelyn said that two of the children have congenital heart conditions: H.J. has supraventricular tachycardia and will require surgery when he is older, while J.J. has a heart murmur. J.J. also has "horrible allergies," including to cats, and frequently needs to take antibiotics. Katelyn testified that Jared nevertheless "has three cats right now," and after the children spent Thanksgiving with him, J.J. came back with rashes on her legs. Katelyn said that Jared refuses to get rid of the cats because "[h]e says he doesn't want mice."

According to Katelyn, she was cooking dinner one time when she heard gunshots outside. She could not find F.J. at first, but when she went outside, she saw that Jared had "propped up" a large portrait of her face, which her employer had previously given her, against the side of a shed and was "letting [F.J.] shoot" the portrait. Jared told Katelyn that it was F.J.'s idea to shoot at the portrait and that Jared later burned the portrait.

Katelyn submitted an itemized inventory of marital property which stated her proposed valuations and division. She said she currently earns "[a]bout [$]20,000" in monthly gross income as an independent contractor for a company that sells "health and fitness tools" for women. She said that Jared, on the other hand, was unemployed from the time the divorce suit was filed in 2021 until he was ordered to vacate the marital home. As of the time of trial, he was employed and was living on a property owned by his parents, along with four other tenants. According to Katelyn, since Jared moved out of the house,

6

she has paid a total of $54,300 for rent and utilities at Jared's parents' rental property pursuant to the trial court's amended temporary orders. She said that, for a time, she was paying the rent and utilities for all of the tenants living on the property.

Katelyn testified that, before the marriage, she used her own funds and took out a loan to build a house on property owned by her parents. She later sold the house to her mother for $115,000, and she and Jared used all of the proceeds from that sale to make the down payment on their house in Shiner. Thus, Katelyn asserted that $115,000 out of the parties' equity in the house was her separate property.[4]

On cross-examination, Katelyn acknowledged that Jared did not have any positive Soberlink tests during his times of possession throughout the case, and that she had no concerns about leaving the children alone with him when she had to travel for work. She agreed that she would drink alcohol occasionally when the children were not with her. She also agreed that she asked J.J. about Jared's girlfriend and recorded the child's answer with her cell phone. She also recorded a conversation about Jared that she had with H.J. She agreed she had no evidence of Jared "name calling and being ugly in front of the children" other than "the kids telling [her] that it happened."

When asked why she thought it was in the children's best interests for Jared to have standard visitation rather than a 50/50 schedule, she said the "kids are suffering" with the current arrangement in part because Jared "won't let them talk to [Katelyn] in public," and she opined that "it would be less stress for the kids if they were with [her]

---

[4] The parties stipulated that the Shiner property was worth $1,450,000 overall, and that there was a mortgage on the property with a balance of $455,855. They also stipulated that "the community has a reimbursement claim of $108,872" with respect to a house in New Braunfels which was Jared's separate property, but which had been improved using marital funds. Katelyn agreed that she was asking for "that community property claim [to] be awarded to [Jared]" and for the New Braunfels house to be confirmed as Jared's separate property.

more." She conceded that she has made many social media posts "about how great a father Jared is," but she explained that her job required her to "post 10 to 15 stories a day," that she "was trying to portray a certain life," and these were just the "highlights."

## 2. Jared

Jared testified that he underwent an alcohol assessment on August 3, 2023, and that, in response to an intake questionnaire, he agreed that his use of alcohol has "caused emotional problems" and "problems with family and friends" but denied drinking within the four months prior to the assessment. He did not recall being diagnosed with "alcohol use disorder" and being instructed to attend AA meetings twice per week, and he agreed he did not attend such meetings. Instead, he went to see a different counselor, Charity Rogers, for a separate assessment ten days later. Rogers later showed him a substance abuse educational video which lasted several hours. Jared told Rogers that he stopped drinking thirty days before the assessment and that his divorce was caused by Katelyn's "ongoing affair." In a written report entered into evidence, Rogers found that Jared "did not meet diagnostic criteria for a diagnosis of Substance Use Disorder and did not have a medical necessity for treatment of that disorder." According to the report, this determination was based on Jared's "ability to remain completely sober for the past recent months (as evident by the use of Soberlink and self report[ing])."

Jared denied ever telling a counselor in 2015 that he was "a binge drinker," though he admitted telling the counselor that he binge drank once. He then admitted it happened more than once but denied that he had a problem.

Jared testified he never had an affair "during the marriage." He then conceded that he had sex with a woman named Jill in the parties' bedroom during the course of the

8

divorce case, but noted his marriage was not "intact" at the time. He agreed that his statement that he did not have a sexual relationship with Jill, made in response to interrogatories propounded in discovery, was not true. He also agreed that his failure to provide "emotional support" to Katelyn was a "big part" of why the relationship frayed.

Jared denied spending the night in his car passed out drunk, and he denied being passed out in the backyard while two-year-old J.J. was "running around the pool." He denied not allowing the children to talk to Katelyn in public, and he denied "speaking badly" about her in front of the children. He admitted that he "beat up" JT in front of the children, but stated that other than this incident, there has never been any issues with his anger. He stated that shooting at Katelyn's portrait was "[F.J.'s] idea" and that "it wasn't [done] in any type of aggressive or demeaning way." He explained that he regularly shoots at targets with the children and that Katelyn was the one who had put the portrait near a "burn barrel" in the backyard. He agreed that he later burned the portrait because he did not what anyone to see what had been done to it.

On cross-examination by his counsel, Jared testified that Katelyn told him she was having an affair with JT before she filed for divorce, which was "heartbreaking." According to Jared, Katelyn "said that she chose to work it out with [him]" but he then saw JT sitting in Katelyn's car later that afternoon, which upset him.

Jared testified that, in 2015, Katelyn's sister put Xanax in his drink, which caused him to black out. To the best of his knowledge, he did not have sex with Katelyn's sister. He conceded that the parties went to counseling in 2015 in part because of this "incident."

Jared stated that the photos of him sleeping were taken before Katelyn filed for divorce, and that he was not intoxicated at those times. He said, from 2015 to 2021, he

9

would typically drink "[t]wo to three times a week," as would Katelyn. He said he never had any positive Soberlink tests while in possession of the children, and he has never driven with the children while intoxicated.

Jared testified that, at the beginning of the marriage, he worked for Halliburton, but he stopped working there in 2016 because of the onerous schedule. For the next six years, he worked for Katelyn's father at his used car dealership, but he was fired after Katelyn filed for divorce. He then stayed at home with the kids for about a year, and he now works for an engineering firm. Like Katelyn, Jared submitted an inventory detailing his proposed property valuations and division. He said the children are "doing phenomenal" in the current 50/50 custody arrangement and that "[t]here's no conflict" during possession changes. He opined that changing the schedule would not be in the children's best interests because they have a consistent routine.

### 3. Trevino

Trevino testified that she performed a custody evaluation as ordered by the court. As part of her evaluation, she interviewed the parties and collateral witnesses and performed psychological testing. Trevino said it was "very difficult for [her] to get information from Jared because he seems to have blanks in his memory," "very easily gets confused," and often contradicts himself. She said Jared "struggles with understanding and acknowledging some of the issues that . . . have popped up in this relationship," including his drinking, though she stated that his drinking is not a "primary issue" but rather "a symptom of trying to kind of manage emotions that he's not quite able to manage." She further opined that, "if drinking isn't what he's spent a lot of time doing, then I'd have a lot more concerns about his memory problems."

10

Trevino interviewed the husband of Jared's paramour Jill, who reported that Jill asked for a divorce after she and Jared had "been seen together around town" and "her children and Jared's children were spending time together." Trevino also interviewed Katelyn's father, who reported that he fired Jared only after Jared "cursed at him and said he could drink whenever the F he wanted to," including with the children in the car. Trevino did not find evidence that Katelyn was in a sexual relationship with JT, but she did find evidence that they "spent time together," which she agreed "signals a problem in the marriage."

Trevino said Jared was "real defensive" and "didn't seem to recognize consequences of his behaviors." In particular, she was "alarmed by Jared blaming [F.J.] for being the one to decide that they were going to shoot mommy's picture." She said Jared also "showed a lot of difficulty in controlling" his anger.

Trevino said Jared "has a potential to be a good father" and that "the alcohol may be something that's he's using to try and reduce his anger." However, she did not believe that it would be "healthy" for the children to have him as the primary caregiver, in part because she did not "think that he will promote the relationship with the mother the same way the mother will promote the relationship with the father." Further, she opined that the children will need therapy and she did not expect the parties to be able to agree on a therapist. She said she tried to talk to the children but they were agitated and "tearful" so she "wasn't able to get much from them," though F.J. once reported that "daddy says bad things and says to go away to mommy and yells at her." In part because of their refusal to talk openly with her, Trevino did not believe that the children are "doing well enough" for her to recommend continuing the 50/50 arrangement. She said a 50/50 coparenting

11

arrangement "is something that [she] will recommend only in situations . . . when people are working well together or the children are older and want to be able to go back and forth."[5] Trevino opined that this is not one of those situations.

Trevino recommended that both parents be named managing conservators; that Katelyn be granted the rights to determine the children's residence and to make non-emergency medical and education decisions for the children after providing notice to Jared; and that Jared have standard visitation rights, except that his summer visitation be four one-week periods instead of one month-long period. *See* TEX. FAM. CODE ANN. § 153.312 (setting forth standard possession order for parents who reside 100 miles or less apart). She also recommended that Jared "be encouraged to address alcohol issues," either by continuing to use Soberlink,[6] by entering an inpatient treatment program, or by attending thirty AA meetings in thirty days; that the parties retain a parenting facilitator; and that the parties find a therapist for the children with experience in alcohol issues. Her written report was entered into evidence.

On cross-examination, Trevino agreed that "most of this report consists of just simply things that either Kate or Jared told [her]," though she said she attempted to verify allegations where possible through interviews with collateral witnesses. She agreed that, as part of her evaluation, she reviewed a video recording of Katelyn "interviewing" J.J. about the case, which Katelyn provided to her; Trevino denied that this was problematic. Trevino further stated that she believed Jill's husband's representations to her because he knew that they were not confidential and would be attributed to him in her report to the

---

[5] Trevino later said, "I don't do 50/50 unless I really have to."

[6] Trevino stated that she has "never seen anybody postdivorce wearing a Soberlink device," but she "put it in [her recommendations] because [Katelyn] wanted it."

12

court. She acknowledged that Jared has not had a positive Soberlink test throughout the case, but she said "any comfort I get [from that fact is] washed away by him sitting up here and saying he's never had a problem with drinking, does not now have a problem with drinking." She agreed that Katelyn communicated with her far more than Jared did during the pendency of the case.

## C. Decree and Findings

The decree declared the parties divorced, named both parties as joint managing conservators of the children, granted Katelyn the exclusive right to designate the children's primary residence, and provided that Jared shall have modified standard visitation with the children, as recommended at trial by Trevino. Jared was ordered to pay $1,612 per month in child support. As to property division, the decree awarded Katelyn 100% of the parties' equity in the marital residence. It also granted her request for $53,590 in reimbursement from Jared relating to community funds he allegedly wasted. Aside from those items, the decree largely split the remaining marital property evenly between the parties. Pursuant to Jared's request, the trial court subsequently entered findings of fact and conclusions of law. This appeal followed.

## II. DIVISION OF COMMUNITY ESTATE

By his first issue, Jared contends that the trial court's disproportionate division of property was "unfair and unjust." He asserts that "the effect of the trial court's ruling" is to award Katelyn 78% of the value of the marital estate and to award him only 22%, and that there is "no reasonable explanation" for the unequal awards. Katelyn concedes in her brief that the decree awarded her 75% of the marital estate but argues that such a division was supported by the evidence and was within the trial court's discretion.

**A.  Applicable Law and Standard of Review**

In a divorce decree, the trial court must order a division of the community estate "in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage." TEX. FAM. CODE ANN. § 7.001. In making a just and right division,

> the trial court may consider such factors as the spouses' capacities and abilities, benefits which the party not at fault would have derived from continuation of the marriage, business opportunities, education, relative physical conditions, relative financial condition and obligations, disparity of ages, size of separate estates, and the nature of the property.

*Murff v. Murff*, 615 S.W.2d 696, 699 (Tex. 1981); *see Bradshaw v. Bradshaw*, 555 S.W.3d 539, 543 (Tex. 2018). A court's evaluation of these factors "may at times lead to a disproportionate division of assets and liabilities of the parties, depending on the circumstances." *Schlueter v. Schlueter*, 975 S.W.2d 584, 588 (Tex. 1998). There must be some reasonable basis for an unequal division of the property. *See Murff*, 615 S.W.2d at 698–99.

"Because the standards for dividing a community estate involve the exercise of sound judgment," a trial court is accorded "wide discretion" in dividing a community estate, and the appellant bears the burden to show from the record that the division was so disproportionate as to be "manifestly unjust and unfair." *Bradshaw*, 555 S.W.3d at 543; *see Murff*, 615 S.W.2d at 699; *Hedtke v. Hedtke*, 248 S.W. 21, 23 (Tex. 1923). The appellate court may not merely reweigh the evidence, but "a trial court has no discretion in determining what the law is or applying the law to the facts, even when the law is unsettled." *Bradshaw*, 555 S.W.3d at 543.

**B.  Analysis**

A trial court's finding of adultery or other fault in the breakup of the marriage can

support the disproportionate division of community property. *See Young v. Young*, 609 S.W.2d 758, 762 (Tex. 1980); *In re Marriage of C.A.S. & D.P.S.*, 405 S.W.3d 373, 392 (Tex. App.—Dallas 2013, no pet.); *see In re S.A.A.*, 279 S.W.3d 853, 856 (Tex. App.—Dallas 2009, no pet.) (noting that "adultery" means "voluntary sexual intercourse of a married person with one not the spouse"). "The division should not be a punishment for the spouse at fault." *Young*, 609 S.W.2d at 762; *see Bradshaw*, 555 S.W.3d at 543. And, "[a]lthough adultery may be proved by direct and circumstantial evidence, clear and positive proof is necessary and mere suggestion and innuendo are insufficient." *In re S.A.A.*, 279 S.W.3d at 856; *see Ayala v. Ayala*, 387 S.W.3d 721, 733 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

Here, the trial court stated in its findings of fact that Jared "is guilty of adultery" and "is guilty of cruel treatment toward [Katelyn]." Jared does not dispute that there was clear and positive evidence to support these findings. Instead, he summarily argues that "there is no evidence" to support two specific valuations in the trial court's findings of fact: (1) finding number 50, which in part valued the "waste claim against [Jared]" at $53,590; and (2) finding number 53, which stated that "[t]he community estate has a reimbursement claim of $108,872 against [Jared's separate real property in New Braunfels]." But as Katelyn notes, the parties stipulated to the fact that the community was owed $108,872 in reimbursement for funds spent to benefit Jared's separate property. Further, the evidence supported the valuation of Katelyn's waste claim insofar as she testified that $54,300 of community funds were spent to benefit Jared's parents' rental property.

In his reply brief, Jared contends that the trial court "failed to articulate any basis for the disproportionate award" and "added justification of adultery after complaint of the

grossly disproportionate award as an after-thought."[7] We disagree. The trial court's findings state that Katelyn is entitled to a disproportionate share of the estate "based on the following":

a.   fault in the breakup of the marriage;

b.   benefits the spouse may have derived from the continuation of the marriage;

c.   the spouse to whom conservatorship of the children is granted;

d.   community indebtedness and liabilities;

e.   nature of the property involved in the division;

f.   wasting of community assets by Respondent;

g.   credit for temporary support paid by Petitioner to Respondent;

h.   community funds used to pay down the secured liability of a third party;

i.   reimbursement;

j.   expected inheritance of a spouse;

k.   attorney's fees to be paid; and

l.   creation of community property by the efforts or lack thereof of the spouses.

The list provided in the findings is generic and is not tailored to the specific facts of this case. However, aside from complaining that there are no specific findings concerning "benefits the spouse may have derived from the continuation of the marriage," Jared does

---

[7] Following trial, the trial court sent the parties a letter explaining that the divorce was granted on grounds of insupportability, generally setting forth its rulings on possession and property division, and requesting Katelyn's counsel to prepare a final decree consistent with the letter. However, "a pre-judgment letter does not constitute competent evidence of the court's ultimate decision." *Beard v. Beard*, 49 S.W.3d 40, 66 (Tex. App.—Waco 2001, pet. denied) (citing *Cherokee Water Co. v. Gregg Cnty. Appraisal Dist.*, 801 S.W.2d 872, 878 (Tex. 1990)). The actual decree states that the divorce was granted "on the grounds of insupportability, adultery on the part of [Jared], and cruelty on the part of [Jared]." These determinations were reiterated in the trial court's findings of fact.

16

not address any of the factors mentioned in the list.

We conclude that the trial court did not abuse its discretion in its division of the marital estate.[8] *See Murff*, 615 S.W.2d at 698. Jared's first issue is overruled.

### III. STANDARD POSSESSION ORDER

By his second issue, Jared argues that "[t]he trial court did not have sufficient evidence upon which to make the order of standard possession." He argues that "[t]he majority of the evidence preponderates toward maintaining the agreement of the parties, as each of the parties plead[ed]," and that "[t]he recorded testimony and evidence preponderates toward a finding that the 50/50 arrangement was working."

### A. Standard of Review and Applicable Law

The trial court is afforded great discretion when determining issues relating to the parent-child relationship, including possession. *See In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021); *In re K.L.C.*, 672 S.W.3d 734, 743 (Tex. App.—Corpus Christi–Edinburg 2023, no pet.). A trial court abuses its discretion "if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Walker v. Baptist St. Anthony's Hosp.*, 703 S.W.3d 339, 343 (Tex. 2024). A trial court does not abuse its discretion when its order is supported by "some evidence of a substantive and probative character." *Rumscheidt v. Rumscheidt*, 362 S.W.3d 661, 667 (Tex. App.—Houston [14th

---

[8] In his first issue, Jared also argues that the decree "contains discrepancies" from the findings of fact and conclusions of law. *See Zorilla v. Wahid*, 83 S.W.3d 247, 254 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.) ("Findings of fact and conclusions of law filed after a judgment are controlling if there is any conflict between them and the judgment."), *abrogated on other grounds by Iliff v. Iliff*, 339 S.W.3d 74 (Tex. 2011). Specifically, he contends that (1) the findings and conclusions state that Katelyn's "attorney's fees were a liability of the estate" whereas the decree states that each party shall be responsible for their respective attorney's fees; and (2) the findings and conclusions state that three all-terrain vehicles were awarded to Katelyn, whereas the decree awarded two of them to him. Jared asserts that "[w]hile such errors may seem small, they are indicative of the trial court's abuse of discretion." We disagree. In any event, we have reviewed the record and can discern no conflict between the decree and the findings.

17

Dist.] 2011, no pet.).

In determining whether the trial court abused its discretion, we review the "evidence in a light most favorable to the court's decision and indulge every legal presumption in favor of its judgment." *In re J.I.Z.*, 170 S.W.3d 881, 883 (Tex. App.—Corpus Christi–Edinburg 2005, no pet.). "[T]he trial judge is best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *In re P.M.G.*, 405 S.W.3d 406, 410 (Tex. App.—Texarkana 2013, no pet.) (quoting *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.)). Thus, we "defer to the trial court's judgment in matters involving factual resolutions and any credibility determinations that may have affected those resolutions." *Id.*

The sufficiency of the evidence to support a custody ruling is a relevant factor to consider in assessing whether the trial court abused its discretion. *In re R.T.K.*, 324 S.W.3d 896, 899 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). To assess this factor, "we consider whether the trial court had sufficient information upon which to exercise its discretion and whether it erred in its application of that discretion." *In re M.M.M.*, 307 S.W.3d 846, 849 (Tex. App.—Fort Worth 2010, no pet.).

**B.      Analysis**

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." TEX. FAM. CODE ANN. § 153.002; *In re Marriage of Christensen*, 570 S.W.3d 933, 938 (Tex. App.—Texarkana 2019, no pet.). Factors considered in the best interest inquiry include: (1) the desires of the children; (2) the emotional and physical needs of the children now

18

and in the future; (3) the emotional and physical danger to the children now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the children; (6) the plans for the children by the individuals seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). "Proof of best interest is not limited to these factors, nor do all factors always apply in every case." *In re S.A.H.*, 420 S.W.3d 911, 926 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Jared does not address the *Holley* factors in his brief. Instead, his second issue principally relies on the fact that Katelyn did not explicitly ask for a standard possession order in her written pleadings. *See* Tex. R. Civ. P. 301 ("The judgment of the court shall conform to the pleadings . . . ."). Instead, as noted, her live petition stated that the parties would likely enter into an agreement regarding possession and asked the trial court to render judgment on that agreement. However, it also asked for the trial court to make the decision itself in the event no agreement was reached. And though Katelyn's live petition did not specifically request a standard possession order, it also did not request a continuation of the 50/50 arrangement. In fact, the one specific request that Katelyn made in her live petition regarding possession was that all of Jared's visitation be supervised because of his "history or pattern of consuming too much alcohol." From this request, Jared had fair notice that Katelyn was seeking an order which significantly restricted his possession. *See In re A.D.*, 474 S.W.3d 715, 730 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (noting that, to evaluate the sufficiency of pleadings, "we consider whether the

opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant"); *see also Leithold v. Plass*, 413 S.W.2d 698, 701 (Tex. 1967) ("Technical rules of practice and pleadings are of little importance in determining issues concerning the custody of children.").

Even assuming Katelyn's written pleadings failed to put Jared on notice of her request, her trial testimony surely did, and Jared's counsel made no objections. *See* TEX. R. CIV. P. 67 ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."); *Ingram v. Deere*, 288 S.W.3d 886, 893 (Tex. 2009) ("When both parties present evidence on an issue and the issue is developed during trial without objection, any defects in the pleadings are cured at trial, and the defects are waived."); *Mintvest Capital, Ltd. v. Coinmint, LLC*, 693 S.W.3d 834, 841 (Tex. App.—Houston [14th Dist.] 2024, no pet.) (noting that an "unpleaded issue may be deemed tried by consent when evidence on the issue is developed without objection under circumstances indicating both parties understood the issue was being contested").

The remainder of Jared's second issue focuses on the legal propriety and credibility of Trevino's evaluation and written report. Jared notes that, under the Texas Family Code, a custody evaluator "shall follow evidence-based practice methods and make use of current best evidence in making assessments and recommendations." TEX. FAM. CODE ANN. § 107.108(c). Further, "[t]o the extent possible, a child custody evaluator shall verify each statement of fact pertinent to a child custody evaluation and shall note the sources of verification and information" in the evaluator's written report." *Id.* § 107.108(e). Without elaboration or citation to any specific portion of the record, Jared

argues that Trevino "did not follow evidence-based practice methods in making her evaluation," but rather "decided which person to believe, and failed to verify the facts related by the other party."

Jared did not object to Trevino's report at trial, on these or any other grounds. *See* Tex. R. App. P. 33.1(a)(1) (regarding preservation of error for appeal). Even if he did, the record does not reflect that the report failed to meet statutory requirements. Trevino explained that she interviewed collateral witnesses in an effort to verify the allegations regarding each party's conduct. Regardless, the trial court was the exclusive arbiter of witness credibility, *see In re P.M.G.*, 405 S.W.3d at 410, and was thus entitled to believe Trevino's testimony that 50/50 possession would not be in the children's best interest.[9] The trial court was also entitled to believe testimony to the same general effect by Katelyn, which Jared does not mention on appeal. *See id.*

Having reviewed the record in light of the *Holley* factors, 544 S.W.2d at 371–72, we conclude that the trial court did not abuse its discretion in rendering a modified standard possession order. *See Rumscheidt*, 362 S.W.3d at 667. Jared's second issue is overruled.

## IV.    Judicial Bias

By his third issue, Jared contends that "the absence of an impartial judge deprived [him of] his right to a fair trial." He observes that, prior to the beginning of trial, the trial

---

[9] Jared asserts that "Trevino's report and testimony must be weighed against the testimony by [other witnesses] that [he] is a good, hands-on, super dad, involved in his children's lives, and is well respected in the community as a good dad, and that the children were doing well and thriving." That is true (though we note that Katelyn's testimony is also properly part of this equation), but it is the trial court that does the weighing, not this Court. *See Bradshaw v. Bradshaw*, 555 S.W.3d 539, 543 (Tex. 2018); *see also In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (noting that "witness credibility issues that depend on appearance and demeanor cannot be weighed by the appellate court [because] the witnesses are not present" (internal quotation omitted)).

21

court stated, "I know enough history in this case" and "I'm very well aware of the issues that have happened thus far." He further claims that there were only two hearings prior to the final trial during which the court could have gleaned information about the case; that "the first hearing was a short rendition of agreements" with no testimony or evidence received; and that "[a]t the second hearing, there was some testimony of [Jared]'s relationship with Jill, which occurred after the divorce proceedings began, but not a complete history of the issues to be determined at final trial such that a predetermination could have been made." Throughout his brief, Jared points to numerous instances in the record where the trial court, noting that the trial had been scheduled for only one day, encouraged the attorneys to avoid repetitious questioning. Based on all of this, Jared asserts that "[i]t is apparent that the trial court had some extrajudicial information upon which she pre-determined her bias toward [Jared]."

All parties have a due process right to a fair and impartial trial before a neutral judge. *Ellason v. Ellason*, 162 S.W.3d 883, 887 (Tex. App.—Dallas 2005, no pet.); *Earley v. State*, 855 S.W.2d 260, 262 (Tex. App.—Corpus Christi–Edinburg 1993, pet. dism'd) (citing *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973)); *see* U.S. Const. art. XIV; Tex. Const. art. I, § 13. But we presume the trial judge was neutral and detached in the absence of a "clear showing to the contrary." *In re K.L.R.*, 162 S.W.3d 291, 312 (Tex. App.—Tyler 2005, no pet.); *Earley*, 855 S.W.2d at 262; *see Kemp v. State*, 846 S.W.2d 289, 305–06 (Tex. Crim. App. 1992) ("[B]efore alleged bias becomes sufficient to warrant the disqualification of a judge, it must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." (internal quotation omitted)).

22

Jared has not come close to making that showing in this case. A trial court has broad discretion to conduct a trial and may express itself in exercising this discretion. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240–41 (Tex. 2001); *see also In re C.L.M.*, No. 01-23-00919-CV, 2025 WL 2165184, at *23 (Tex. App.—Houston [1st Dist.] July 31, 2025, no pet. h.) (mem. op.). That discretion permits a trial court to "intervene to maintain control in the courtroom, to expedite the trial, and to prevent what it considers to be a waste of time." *Dow Chem. Co.*, 46 S.W.3d at 241; *see also Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (stating trial court has inherent power to control disposition of cases "with economy of time and effort for itself, for counsel, and for litigants"); TEX. R. EVID. 611(a) ("The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."). The trial court's exhortations to the attorneys in this case fall squarely within that discretion. Moreover, we find nothing in the record to support the scurrilous allegation that the trial court somehow obtained extrajudicial information about the case. Instead, there was ample information already in the record before trial—including the pleadings, Katelyn's testimony at the June 2, 2022 hearing, and Trevino's written report—from which the trial court could have learned the case history and the relevant issues in dispute.

Jared finally argues that "[t]he grossly unfair and unjust division of property, and ordering standard possession when it had not been plead[ed] for, and the testimony was that the 50/50 agreement was working well for the parties and the children, shows a pervasive bias and prejudice against [him]." Judicial rulings alone are rarely sufficient to

demonstrate judicial bias or partiality. *See Dow Chem. Co.,* 46 S.W.3d at 240. Indeed, "[i]t is only in the rarest circumstances . . . that judicial rulings demonstrate the degree of favoritism or antagonism necessary to show that a fair and impartial trial was not possible." *Ellason*, 162 S.W.3d at 887; *see also In re E.M.*, No. 02-18-00351-CV, 2019 WL 2635565, at *3 (Tex. App.—Fort Worth June 27, 2019, no pet.) (mem. op.) ("Allegations that a judge has put his or her thumb on the scale should not be made simply because a party disagrees with the judge's rulings."). We have already concluded that the trial court did not abuse its discretion in its property division or possession orders. We further conclude that those orders do not demonstrate that the trial court was biased or partial.

Considering the entire record, we conclude the trial court did not harbor a "deep-seated favoritism or antagonism that would make fair judgment impossible." *See Gaal v. State*, 332 S.W.3d 448, 454 (Tex. Crim. App. 2011) ("[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." (citing *Liteky v. United States*, 510 U.S. 540, 555 (1994)). Jared's third issue is overruled.

## V. CONCLUSION

We affirm the trial court's judgment.

YSMAEL D. FONSECA
Justice

Delivered and filed on the
30th day of October, 2025.